**Johnny JAMES, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69653.

Court of Criminal Appeals of Texas, En Banc.

April 26, 1989.

Rehearing Denied June 7, 1989.

Steve Hebert, court appointed, Ronald L. Marsh, court appointed, Baytown, for appellant.

Michael R. Little, Dist. Atty., and Georgia L. Clapper, Asst. Dist. Atty., Anahuac,

Robert Huttash, State's Atty., Austin, for the State.

OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A., Penal Code § 19.03(a)(2). After finding the appellant guilty, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

The appellant was convicted of intentionally causing the death of Barbara Harrington Mayfield in the course of committing and attempting to commit the aggravated sexual assault of A.H. Appellant raises sixteen points of error.[1] We will affirm appellant's conviction.

In his first point of error, appellant argues that the evidence was insufficient to support the jury's affirmative answer to the second special issue. Art. 37.071(b)(2) V.A.C.C.P. Although appellant does not argue that the evidence was insufficient to support his conviction for capital murder, a complete recitation of the facts underlying his conviction is necessary because those facts could have been used by the jury when considering appellant's future dangerousness. *Mitchell v. State*, 650 S.W.2d 801, 812 (Tex.Cr.App.1983).

On October 21, 1985, appellant left his home in Winnie, Texas to go to Gilchrist, Texas. Appellant was armed with a .38 caliber Rossi revolver and indicated in a signed statement that he had been drinking heavily all day. At approximately 10:00 P.M., appellant left B.J.'s Lounge in High Island, Texas with the bar's proprietor, Barbara Mayfield. In his signed statement, appellant said that he was "messing around" with the gun and accidentally shot the floor board of the car, learning afterwards that he had inadvertently shot Mayfield in the foot. The physical evidence contradicted appellant's version of the facts.[2] At some point after this shooting, appellant gave Mayfield a bed sheet to wrap around her foot and put her into the trunk of his car.

At approximately 1:00 A.M. on October 22, appellant drove into the parking lot of a convenience store in Winnie, Texas. He entered the store, looked around, and pulled a gun from a bag. Appellant pointed the gun at A.H.'s face. Appellant told A_____ H_____, the clerk, to give him all of the money and handed her the bag, and she put the money into the bag. Appellant, still pointing the gun at her, told A_____ H_____ to get into the car. When they were in the car, appellant told A_____ H_____ to do as he said or she would end up "like the other one." When appellant made this threat, he pointed to a pool of blood on the floor in front of the passenger's seat.

The two drove to the "Hebert Road," which is an isolated, rural road outside of Winnie. Appellant stopped the car and told A_____ H_____ to drive, but she told appellant that she couldn't drive a car with a standard transmission. Appellant and A_____ H_____ went to the back of the car. Appellant gave A_____ H_____ the keys and told her to open the trunk. A_____ H_____ tried to open the trunk, but she was nervous and dropped the keys. Appellant picked up the keys and opened the trunk, revealing Mayfield's presence to A_____ H_____ for the first time. A_____ H_____ helped Mayfield out of

---

1. Appellant numbers his points of error one through seventeen; however, he omits point of error three.

2. Mayfield, who supposedly was driving at the time she was shot in the foot, was wearing shoes. Medical testimony indicated that Mayfield had a through-and-through, medium caliber gunshot wound in her foot. Her right shoe, which matched the left shoe found on Mayfield's body and was found at the murder scene, had no bullet hole. There was no bullet hole found in the floor board of the car nor was a bullet found there. In addition, A.H., who was later kidnapped, raped, and shot by appellant, testified that, when she was abducted, she saw a pool of blood on passenger-side floor board, but no blood on the driver's side. Although this evidence does not prove when and how Mayfield's was shot in the foot, it does show that appellant's version could not be true.

the trunk. Appellant told Mayfield to drive the car, and he got into the back seat A_____ H_____ got into the front passenger seat, and Mayfield drove the car further up the road. At some point, appellant instructed Mayfield to pull the car over to the side of the road.

Appellant instructed the two women to get into the back seat of the car. Pointing the gun at them, he told the women to take off their clothes. This done, he said that "he had never seen two ladies make out" and told the women to rub their hands on each others' breasts. After doing this for a while, appellant told the women to put their hands between each others' legs. The women complied, but appellant said "he didn't see the hands moving fast enough." A_____ H_____ testified that they had done this for about twenty to thirty minutes when appellant told her to suck on Mayfield's breast. The women did as appellant instructed until he told them to stop and then got into the back seat with them. Appellant said, "I've never had a black woman before," and then forced A_____ H_____'s mouth onto his penis while holding the gun in his right hand at the back of her head and said, "Suck on this." Appellant told A_____ H_____, "You can do better than that." After a period of time, appellant told A_____ H_____ to stop and then told her to get on top of him and to place his penis in her vagina. He then told A_____ H_____ to move up and down. After ejaculating, appellant told A_____ H_____ to stop. During all of this, Mayfield was huddled there, in the back seat, crying.

Appellant then told everyone to get out of the car. The women put their clothes back on. While A_____ H_____ was tying her shoe, she heard Mayfield shout, "Please, don't do it. Oh my God, don't do it." A_____ H_____ looked back, over her shoulder, and saw appellant aim his gun at her. She raised her arms to cover her head and appellant fired. A_____ H_____ felt that she had been shot and fell to the ground. She decided to play dead hoping appellant would leave her alone. A_____ H_____ then lost consciousness until she was roused by her brother, who was part of a search party organized after it was discovered that she was missing from the convenience store.

According to his own statement, appellant next turned his gun against Mayfield. Medical evidence indicated that Mayfield had been shot twice in the head at very close range. A_____ H_____ was then shot twice more. Appellant's statement said that he then drove back to his home, stopping on the way to dispose of his gun and count the money he took in the robbery. Upon arriving, he told his wife that he had been out hunting and that he had sold his gun for $100.[3]

During the punishment phase of trial the State introduced psychological evidence, reputation evidence, prior bad acts, and appellant's criminal record. Dr. James Grigson testified that, based on a hypothetical question, appellant was a sociopath and that it was a 100% certainty that he would commit acts of violence in the future.[4] A

---

**3.** Appellant received $114 in the robbery. He put the $100 that he attributed to the sale of the gun on the dresser and pocketed the remaining $14 without telling his wife.

**4.** Appellant called Dr. Fred Fason, a licensed psychiatrist, and Dr. Wendell Dickerson, a licensed psychologist, during his portion of the punishment phase. Dr. Fason testified that he believed that a doctor could not form a competent diagnosis of a subject without performing several weeks of diagnostic tests and observation. Dr. Fason explained what procedures he would perform and the importance of these specific procedures. He also testified that the American Psychiatric Association has expressly disavowed attempts by its members to predict future dangerousness. See *Barefoot v. Estelle,*

463 U.S. 880, 896–906 & 918–38, 103 S.Ct. 3383, 3396–3401 & 3407–3418, 77 L.Ed.2d 1090, 1106–1112 & 1120–1133 (1983) (Pages 918–38 appear in a dissent by Justice Marshall with Brennan, J. joining.) for a discussion of the use of psychiatric testimony in answering special issue number two.

Dr. Dickerson, former chief mental health officer for the Texas Department of Corrections, repeated Dr. Fason's general concerns regarding predictions of future dangerousness. In addition, Dr. Dickerson testified that a study conducted by the Texas Department of Corrections concluded that predictions that an individual will commit violent acts in the future are correct in only one out of three instances. Applying the actuarial formula generated by this

police officer and several people from various cities where appellant had lived testified that appellant had a bad reputation for being a peaceful, law-abiding citizen. Ethel Cathey testified that she had been the repeated victim of appellant's uninvited sexual advances and harassment. Lewis Garza testified that he had seen appellant initiate a number of near-altercations with bar patrons. Finally, the State introduced appellant's criminal record. Twice, appellant received probation for driving while intoxicated. Also, in 1972, appellant was convicted of burglary of a habitation. Appellant received five years' probation for this conviction and completed his probationary period.[5]

Appellant cites a number of cases in which this Court has found that the evidence was insufficient to support an affirmative answer to the second special issue, and argues that these cases are similar to his. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987); *Garcia v. State,* 626 S.W.2d 46 (Tex.Cr.App.1981); *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981); *Roney v. State,* 632 S.W.2d 598 (Tex.Cr. App.1982); *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978). Without individually detailing and distinguishing the facts of the cases cited by appellant, we find that there is more evidence tending to show that appellant will continue to be a threat to society than in any of these cases.

When deciding whether there was sufficient evidence to support a jury's finding that a defendant will constitute a continuing threat of violence to society, this Court must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(2) [V.A.C.C.P.] beyond a reasonable doubt.

*Keeton,* supra at 61. In reviewing this point of error, we will outline the evidence that we find to be important in upholding the jury's findings.

■ The facts of this crime are heinous and exhibit a brutal disregard for fundamental human dignity and life. In a period of several hours, appellant committed two kidnappings, aggravated sexual assault, aggravated robbery, capital murder, and attempted capital murder. In addition to this impressive array of crimes, appellant compounded his inhumanity by the manner in which he terrorized his two victims. The deceased, Barbara Mayfield, was locked in the trunk of appellant's car, left frightened and bleeding with a painful, but not fatal, gunshot wound. Ms. Mayfield and A.H. were both forced to suffer the indignity of being forced to disrobe, at gun point, and perform homosexual acts upon a stranger. "As this Court has previously stated, the circumstances of the capital offense itself, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue." *O'Bryan v. State,* 591 S.W.2d 464, 480 (Tex.Cr.App.1979). We find these facts to be so shocking that a rational trier of fact could have answered "yes" to the second special issue based solely on the facts of appellant's offense.

■ Psychiatric predictions may constitute a basis for finding a defendant to be a continuing threat to society. *Cockrum v. State,* 758 S.W.2d 577, 593 (Tex.Cr.App. 1988). A rational trier of fact could have believed Dr. Grigson's testimony that appellant was certain to constitute a continuing threat to society and answered "yes" based on this testimony.

■ Reputation evidence may be probative of future dangerousness. *Cockrum,* supra at 593; *Rougeau v. State,* 738 S.W.2d 651, 668 (Tex.Cr.App.1987). Here,

---

study to appellant, Dr. Dickerson found that appellant is in the lowest of three risk categories to engage in future violent conduct.

5. Although appellant completed his probation, testimony from the Collin County Adult Probation office indicated that he was far from a model probationer. Appellant, in violation of the conditions of his probation, failed to pay his probation fees, failed to report to his probation officer for months at a time, left the state without permission on at least two occasions, and continued to consort with undesirable people. Apparently, appellant was continued on probation because of his youth, he was 17 when the offense was committed, and because appellant's father actively encouraged appellant to violate his probation.

several witnesses testified that appellant had a bad reputation as a peaceable, law-abiding citizen. A jury could have used this evidence, in part, to find that appellant would present a continuing threat to society.

▉▉▉▉ Prior criminal record may serve as a basis for adjudging a defendant to be a future danger to society. *Keeton,* supra at 61; *Brasfield v. State,* 600 S.W.2d 288, 293 n. 3 (Tex.Cr.App.1980). Appellant was convicted of driving while intoxicated and burglary of a habitation. Appellant argues that none of these convictions implicate acts of violence. A similar contention was rejected in *Cockrum,* supra, concerning attempted burglary of a habitation.

> Burglary provides an inherent potential to escalate into violence, and ... attempted burglary of a *habitation,* provides a particularly high potential for violence. The legislature has acknowledged the reality of this threat by grouping burglary of a habitation with burglary while armed with a deadly weapon and causing injury to a person while in the course of committing burglary as aggravating elements. V.T.C.A. Penal Code, § 30.02(d). A rational jury could well interpret these prior offenses as inherently dangerous practices, fraught with potentially life-threatening possibilities.

*Id.* at 593 (footnote omitted). Thus, appellant's burglary conviction could have contributed to the jury's affirmative answer to the second special issue.

We find that the evidence was sufficient to support the jury's finding on the second special issue. Appellant's first point of error is overruled.

▉▉▉ In his thirteenth point of error, appellant argues that "the Texas death penalty statute is unconstitutional because it allows execution for crimes committed before the offender was eighteen years old in violation of international law which is superior to state law under Article VI section 2 of the United States Constitution." We have held that:

> [W]hen challenging the constitutionality of a statue, it is incumbent upon the defendant to show that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional as to others is not sufficient.

*Parent v. State,* 621 S.W.2d 796, 797 (Tex. Cr.App.1981) (citations omitted). The record reflects that appellant was approximately 31 years old when this offense was committed. Thus, the alleged constitutional infirmity of which appellant complains does not apply to him. Appellant's thirteenth point of error is overruled.

In his fourteenth point of error, appellant argues that V.T.C.A. Penal Code, § 19.03(a)(2), when predicated upon aggravated sexual assault, violates the equal protection clause of the Fourteenth Amendment. Appellant reasons that, because V.T.C.A. Penal Code, § 22.011 makes it an element of the offense that the victim not be the spouse of the actor, people who are not married to their victims receive less protection under the law than those who are.[6] The State responds that, because there was sufficient evidence to support appellant's conviction under provisions of the charge not relying on aggravated sexual assault, that we need not address appellants argument. In addition, the State argues that the statutory scheme of section 22.011 bears a rational relationship to a legitimate State purpose, thus satisfying the equal protection clause.

▉▉▉ The State's contention that we need not address the substance of appellant's point of error is without merit. *Vasquez v. State,* 665 S.W.2d 484 (Tex.Cr.App. 1984), cited by the State for this proposition, merely holds that if the evidence is sufficient to support a conviction under one theory of a jury charge, this Court need not

---

**6.** This discussion would have no bearing on an offense committed after September 1, 1987. When appellant committed this offense, aggravated sexual assault, V.T.C.A. Penal Code, § 22.021, was defined in terms of a sexual assault within the meaning of section 22.011 plus presence of an aggravating factor. Now, section 22.021 sets out the elements of aggravated sexual assault without incorporating section 22.-011. Aggravated sexual assault no longer requires that the victim not be the spouse of the actor.

inquire into the sufficiency of the evidence to support alternate theories. *Id.* at 487. *Vasquez* does not apply to situations in which a conviction could be based on an unconstitutional statute. When a general verdict is returned, and when one of the theories set out in the jury charge was based on an unconstitutional statute, and it is impossible to discern whether the jury relied on the unconstitutional provision, the conviction must be reversed. *Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 535 75 L.Ed. 1117, 1122–1123 (1931). Thus, because this jury returned a general verdict and could have relied on the aggravated sexual assault theory, the constitutionality of section 22.011, as incorporated by section 19.03(a)(2), is essential to the validity of appellant's conviction.

A statutory distinction between two classes of people will survive a challenge under the equal protection clause if the statutory scheme serves a legitimate state interest. J. Nowak, R. Rotunda, & J. Young, *Constitutional Law* 585–86 (1983). The importance of the state interest and the degree to which the statutory scheme must be tailored to serve that interest is dependent upon the class distinction drawn and the nature of the individual rights implicated. If the classification is "suspect," courts must review the statutory scheme with "strict scrutiny," satisfying itself that the state interest is "compelling" and narrowly tailored to serve its purpose. E.g. *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). Likewise, if a classification, although not "suspect," serves to deny an affected group a fundamental right, the statutory scheme must survive strict scrutiny. E.g., *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). On the other hand, if the classification is not suspect and the right implicated is not one recognized as fundamental, the statutory scheme need only bear a "rational relationship" to its intended purpose. E.g., *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *reh. denied,* 450 U.S. 960 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981). Thus, given the multitiered nature of equal protection analysis,

our first task in addressing appellant's point of error is to assign the proper standard of review to the problem.

Marital status is not a suspect classification requiring strict scrutiny. *Califano v. Jobst,* 434 U.S. 47, 53–54, 98 S.Ct. 95, 99, 54 L.Ed.2d 228, 234–235 (1977). In *Califano v. Jobst,* Jobst, a victim of cerebral palsy, challenged a federal law which canceled his Social Security benefits when he married a woman who was also disabled but who was not receiving Social Security disability payments. Social Security rules provided that disability payments were to end if the beneficiary married. Later, Congress created an exception for those who married persons who were also receiving benefits. Jobst challenged this rule on equal protection grounds. In upholding the rule, the Supreme Court stated:

> [T]he marriage rule cannot be criticized as merely an unthinking response to stereotyped generalizations about a traditionally disadvantaged group, or as an attempt to interfere with the individual's freedom to make a decision as important as marriage.

*Id.* at 54, 98 S.Ct. at 99. Finding that no fundamental right was implicated, the Court went on to conduct a "rational basis" analysis of the statute.

In his brief, appellant does not explicitly state which of his rights are implicated by this classification. He argues that a similarly situated person who had raped and murdered his spouse would only be subject to murder, rather than to capital murder, charges. From this statement we infer that appellant could be asserting three possible "rights": (1) Appellant's right to see such a person prosecuted for capital murder; (2) Appellant's right not to be prosecuted for capital murder; or (3) Appellant's abstract interest in seeing that everyone is treated completely equally. None of these are sufficient to trigger a heightened level of scrutiny. First, no person has a cognizable judicial interest in the criminal prosecution or non-prosecution of another. *R.S. v. D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536, 541 (1973).

Second, neither the interest in not being prosecuted nor a general interest in seeing that all are equally treated is sufficient to raise the level of equal-protection scrutiny above "rational basis." See *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).[7] For these reasons, we believe that if the State's purpose in excluding spousal rape from section 22.011 is rationally related to this statutory scheme, section 22.011 satisfies the requirements of equal protection.

In his brief, appellant acknowledges that the state may reasonably exclude spousal rapes from section 22.011 in order to preserve "a degree of marital harmony or the privacy of the marital bedroom," and the State adopts this rationale in its brief. Appellant argues that this policy breaks down when extended to capital murder because the Penal Code provides no spousal immunity for homicide. Appellant effectively concedes the rationality of section 22.011 when read apart from the capital murder statute; therefore, our analysis will focus on the extension of this admittedly valid scheme to capital murder.

■ In *Califano v. Jobst,* supra, the Supreme Court found that the purpose of denying benefits to those who were no longer in need of them was served by stopping benefits upon marriage. Congress sought to reduce the sometimes unjust result of this rule by exempting those who married someone else receiving benefits. The Court noted that a large number of spouses that are ineligible for benefits, or who simply do not receive them, are unable to provide for a disabled spouse. The Court held, however, that this inefficiency in the congressional scheme was excusable because:

> The exception, like the general rule itself, is simple to administer. It requires no individualized inquiry into degrees of hardship or need. It avoids any necessity for periodic review of the beneficiaries' continued entitlement. In the cases to which the exception does apply,

it is a reliable indicator of probable hardship. Since the test is one that may be applied without introducing any new concepts into the administration of the trust fund Congress could reasonably take one firm step toward the goal of eliminating the hardship caused by the general marriage rule without accomplishing its entire objective in the same piece of legislation.

*Califano v. Jobst,* supra 434 U.S. at 56–57, 98 S.Ct. at 101–102 (citations and footnotes omitted). The incorporation of section 22.011 by section 19.03's serves a similar function. By not having to specify all of the elements of capital murder in section 19.03, the legislature was relieved from the responsibility of drafting additional statutory language where existing language could be "plugged into" another statute. In addition, courts are allowed to develope a single body of jurisprudence concerning sexual assault which may be directly applied to the sexual assault element of capital murder without the dangers often attendant to analogizing a body of law to a similar, yet distinct, statute. We find that ease of administration was, and remains, a rational reason for the legislature to have excluded spousal rape situations from the capital murder statute. Appellant's fourteenth point of error is overruled.

■ In his sixteenth point of error, appellant complains of the trial court's denial of his motion for change of venue. Appellant's motion was timely filed, stated a congizable reason for change of venue, and was properly accompanied by affidavits in support of his motion. The State controverted appellant's motion in a timely manner, raising a factual issue and the need for a hearing. At the hearing on appellant's motion, appellant called sixteen witnesses. Of these, most were representatives of newspapers or television stations, and all but one witness, including one of appellant's two compurgators, testified that appellant could receive a fair trial. The State called three witness, was prepared to call

---

7. See also T. Clancy, *Equal Protection Considerations of the Spousal Sexual Assault Exclusion,* 16 New England L.R. 1, 11–12 (1980), for an application of *Skinner* to this factual setting and for a general discussion of other equal protection considerations related to this issue.

twenty additional witnesses,[8] and introduced sixty-three affidavits which all said, or would have said, that appellant could receive a fair trial in Chambers County.

In reviewing motions for change of venue, where there is a hearing on the motion and conflicting testimony is adduced, the proper standard of appellate review is whether the trial judge abused his discretion in denying the motion. E.g., *Cockrum v. State,* 758 S.W.2d 577, 584 (Tex.Cr.App. 1988). Here, the vast majority of the testimony indicated that appellant could receive a fair trial.[9] Based on the strength of the evidence indicating that appellant could receive a fair trial, the trial judge did not abuse his discretion. Point of error sixteen is overruled.

In his fifth point of error, appellant complains of the trial judge shuffling the venire after voir dire had begun. Appellant characterizes this shuffle as sua sponte. The State challenges this characterization and argues that appellant failed to preserve this point of error, that the trial court's action was not error,[10] and that, if error, the error was harmless.

After 37 venireman had been qualified as jurors, an additional group of venireman were added to the panel. The trial court asked if either of the parties desired a jury shuffle. Appellant stated that he did not, but the State requested that a shuffle be conducted. Appellant asked, if there was to be a shuffle, that the previously qualified veniremen be shuffled along with the additional group. The trial judge requested authority for allowing such a procedure, and appellant responded that he had found no authority for, or against, it. The State asked whether it would be a full shuffle, mixing those already questioned with those who had not, or a partial shuffle, mixing only the additional veniremen and keeping those already qualified as numbers one through thirty-seven. The judge indicated that he believed it would be a partial shuffle, but he was not sure. There continued to be confusion about which option the judge would use. Eventually, appellant joined the State's motion for a shuffle, but additionally requested that it be a full shuffle. The State withdrew its motion for a shuffle if it were to be a full shuffle. After more jumbled discussion, one of the prosecutors said:

> I object strenuously to any shuffle. We withdraw our request to any shuffle being with any previously qualified jurors. Now, perhaps with those that we haven't talked with, the State certainly wouldn't be opposed to that, if that is what Defense would like to do.

We understand this passage to mean that the State did not request any shuffle, would oppose a full shuffle, and would not oppose a partial shuffle. After more attempts to clarify each others' positions, the trial judge denied the defense request for a full shuffle and ordered a partial shuffle.

Initially, we must determine whether appellant objected in such a manner as to inform the judge that he opposed a partial shuffle. In order to perfect an issue for

---

**8.** The trial judge ruled against appellant's motion before the State called all of its witnesses. When the ruling was made, appellant had already called all of its witnesses. The trial judge was aware of approximately 20 witnesses who were not called to testify.

**9.** Only Amos Rice, one of appellant's two compurgators, testified that he did not believe that appellant could receive a fair trial in Chambers County. Mr. Rice stated that he had not read many news accounts of the murder and did not recall having seen much television coverage. A resident of the western part of Chambers County, he said that his opinion was based primarily on talking to various people around his home at the barber shop, drug store, and grocery store. Given the great mass of contradictory evidence and this witness's limited exposure to the entire county, the trial judge could have reasonably discounted Mr. Rice's testimony.

**10.** The trial judge's decision to deny appellant's request for a shuffle of the entire venire and his ultimate decision to conduct a sua sponte shuffle of a portion of the venire may be characterized as three different types of error. In disposing of this point, we must decide whether it was error to: (1) deny appellant's request for a shuffle of the entire venire, pursuant to Art. 35.11 V.A.C.C.P.; (2) deny appellant's request for a shuffle of the entire venire, as a matter of sound discretion; and (3) perform, sua sponte, a shuffle of a portion of the venire, as a matter of sound discretion.

appeal, an objection is "required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it." *Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Cr.App.1977). In addition, the objection should "afford opposing counsel an opportunity to remove the objection or supply other testimony." *Id.* Here, appellant stated that he wanted a full shuffle. He stated that he did not want a partial shuffle. The State was able to modify its position by withdrawing its original motion for a shuffle and explaining what action it would and would not oppose. In sum, the judge and the State had adequate notice of appellant's position on the question of the jury shuffle, and the judge had notice that he was ruling on a contested matter. See *Purtell v. State*, 761 S.W.2d 360, 365–66 (Tex.Cr.App.1988). This issue was adequately preserved for appeal. We also find that the shuffle was conducted sua sponte because the State disavowed its request for any type of jury shuffle and because appellant's request was clearly limited to a full shuffle.

Our next inquiry is whether the trial judge's sua sponte order for a partial shuffle was error. Art. 35.11 V.A.C.C.P. does not expressly authorize a trial judge to conduct a sua sponte jury shuffle. Appellant bases his argument on this statutory omission and cites *Wilkerson v. State*, 681 S.W.2d 29 (Tex.Cr.App.1984), in support of this proposition.

In *Wilkerson*, supra, the trial judge made some preliminary remarks and then entertained excuses, disqualifications and exemptions of the veniremen. Some time after this, apparently while appellant and the State were in chambers with the trial judge, the court coordinator and the bailiff conducted a jury shuffle of the panel pursuant to a standing order of the judge. After the jury panel was seated in its new positions, the defendant requested an additional shuffle. The trial judge refused the request stating, "I feel there has been a random shuffle and there is a fair order of perspective jurors." *Wilkerson*, supra at 30. We held that the defendant's request was timely because it was made immediately after the trial judge concluded seating the panel and that the judge's sua sponte jury shuffle did not foreclose a proper motion to shuffle on the part of the State or the defendant. *Id.* We did not find that a sua sponte shuffle is error and expressly noted that "nothing in Art. 35.11 expressly prohibits such a sua sponte shuffling...." *Id.* *Wilkerson* fails to state the proposition of law posited by appellant.

■ In addition, there is an important factual distinction between *Wilkerson* and this case. Appellant asked for, and received, a shuffle of the initial jury panel before he was denied the request of which he complains. In *Wilkerson*, the defendant had not exercised his statutory right to a shuffle before the trial judge's denial which lead to his point of error. This difference is important because:

> Article 35.11 gives the defendant an absolute right to have the jury shuffled. This, of course, does not allow the defendant to demand that the panel be continually reshuffled *after his first motion has been granted.* He is entitled, however, to the granting of that first motion, regardless of the manner in which the jury was originally assigned by the clerk.

*Smith v. State*, 648 S.W.2d 695, 696 (Tex.Cr.App.1983) (emphasis added). Thus, in *Wilkerson*, we found that there was a violation of the defendant's statutory right under Art. 35.11. Such a violation results in reversal of conviction, without inquiry into the trial judge's discretion or whether the defendant was harmed by the error. *Hall v. State*, 661 S.W.2d 113, 115 (Tex.Cr.App.1983); *Smith*, supra at 696. Here, appellant cannot assert an automatic, statutory right; therefore, traditional review, asking whether the trial judge abused his discretion and whether error was harmful, is applicable. Appellant did not have an absolute right for the trial court to honor his request for a shuffle of the full panel.

■ Although appellant was not entitled to an *automatic* jury shuffle under Art. 35.11, the question remains whether the trial judge abused his discretion in denying an *additional* shuffle. If the trial judge had agreed to shuffle the qualified

veniremen with those veniremen who had been added, there was a potential that the qualified jurors would have been placed at the end of the panel. If this had occurred, the parties may have had to qualify as many as 45 [11] additional jurors, wasting the weeks of effort required to qualify the first 37. This fear of losing weeks of work amply justified the trial judge's decision not to conduct a full shuffle. We find that the trial judge had good reason for his decision to not grant a full shuffle and did not abuse his discretion.

Finally, we will address the question of whether the trial judge abused his discretion by, sua sponte, ordering a partial shuffle. Although, by careful scanning of the record, we have decided that neither the appellant nor the State had a pending request for a partial shuffle when the trial judge shuffled the panel, the confusion which permeated this bench conference could have left the trial judge with the impression that either, or both, the appellant and the State wanted a partial shuffle. When the State disavowed its request for a partial shuffle, the judge could have easily believed that the disavowal was solely motivated by an attempt to prevent losing the work already done in qualifying 37 veniremen. In addition, only our careful reading of the record revealed that appellant had withdrawn his request for a *partial* shuffle.

■ The trial judge, who is not afforded the luxury of poring over a transcription of the proceedings, could have easily and *reasonably* believed that the State and/or the appellant desired a partial shuffle. It was a reasonable exercise of discretion to attempt to facilitate the desires of the parties because there was no constitutional, statutory, or procedural rule which prohibited the judge's action. By shuffling only the additional jurors, the judge was able to best effectuate what he could have reasonably believed to be the appellant's desire

for some sort of shuffle, without jeopardizing the work already done.

In addition, absent a specific objection, based on the sua sponte nature of the shuffle rather than one based on failure to conduct a full shuffle the judge's action was the best way to achieve the appellant's desire without wasting the jury qualification that had been done. Appellant's fifth point of error is overruled.

■ In points of error six and seven, appellant complains of the trial court's failure to grant motions requesting two veniremen be struck for cause because of their inability or unwillingness to consider voluntary intoxication in mitigation of punishment pursuant to Art. 35.16(c)(2) V.A.C. C.P. Relying on *Demouchette v. State*, 731 S.W.2d 75 (Tex.Cr.App.1986); *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987), the State responds that appellant failed to preserve this alleged error by failing to exhaust his peremptory challenges. In *Demouchette*, we stated:

When the trial court errs in overruling a challenge for cause against a venireman, the defendant is harmed only if he used a peremptory strike to remove the venireman and thereafter suffers a detriment from the loss of the strike. *Error is preserved only if the defendant exhausts his peremptory challenges*, is denied a request for an additional peremptory challenge, indentifies a member of the jury as objectionable and claims that he would have struck the juror with a peremptory challenge.

*Id.* at 83 (emphasis added). Because appellant had peremptory challenges available for use on both of the juror's challenged in this appeal and failed to exercise those challenges, we find that the alleged error was not preserved for review. Points of error six and seven are overruled.

■ In his seventeenth point of error, appellant argues, without citing any authority, that appellant's confession was not voluntarily given. Appellant sought to

---

**11.** All parties were in agreement that 45 veniremen must be qualified to begin voir dire. Apparently this number was reached by adding the number of the State's peremptory challenges, the number of appellant's peremptory challenges, and the number of jurors required, allowing for three alternates.

have the confession suppressed at a pretrial hearing and now argues that he gave the statement in order to be removed from solitary confinement, not have sexual assault charges brought against him, and to be allowed contact with his wife. The State responds by countering appellant's factual assertions and arguing that appellant waived error by failing to object at the time the confession was admitted into evidence.

Appellant filed a pretrial motion to suppress his confession. This motion was overruled by the trial judge. During the trial, the State offered an edited version of the confession into evidence. When the evidence was offered, appellant's attorney stated, "Judge, we have no objection to 145–A [the confession]." This Court has held that:

> It is settled that when a pretrial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error. However, when the accused affirmatively asserts during trial the has "no objection" to the admission of the complained of evidence, he waives any error in the admission of the evidence despite the pretrial ruling.

*Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Cr.App.1985).[12] We hold that appellant's affirmative statement that he had "no objection" waived any error that might have occurred when the confession was admitted. Appellant's seventeenth point of error is overruled.

▆▆ In appellant's tenth point of error, he complains of the prosecutor's argument to the jury in which he referred to Barbara Mayfield's "naked body." The evidence showed that Mayfield was clothed when her body was discovered. The State contended that there was a transcription error in the statement of facts, and upon a motion by the State, we abated this appeal to determine whether the statement of facts should be corrected. *James v. State*, 745 S.W.2d 28 (Tex.Cr.App.1988). After testimony by the court reporter as to the content of her original notes, the statement of facts was amended to reflect that the prosecutor referred to Mayfield's "dead body." This point of error is now moot, and appellant does not challenge the procedure by which the statement of facts was amended. Appellant's tenth point of error is overruled.

In his eighth point of error, appellant argues that State's exhibits forty-six through sixty-three should not have been admitted into evidence because their prejudicial effect would outweigh their probative value. These exhibits are 8×10, color photographs of Barbara Mayfield's body, as it appeared on a mortuary slab prior to autopsy. Relying on *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972), and *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App. 1972), appellant contends that if the probative value of a photograph, or, for that matter, any evidence, is outweighed by its improper prejudicial effect, that piece of evidence is inadmissible. Appellant argues that the probative value of these photographs is slight because they were not used by any witness to assist his or her testimony.[13] The State responds by offering a number of theories alleging that appellant waived this point of error and finally addresses the merits of appellant's claim

**12.** *Gearing* is factually distinguishable from the instant case because the defendant in *Gearing* failed to obtain an adverse ruling during his pretrial hearing. This distinction, however, does not apply to the three cases on which *Gearing* relied for this proposition of law. *Harris v. State*, 656 S.W.2d 481, 484 (Tex.Cr.App. 1983); *Mayberry v. State*, 532 S.W.2d 80, 84 (Tex.Cr.App.1976); *McGrew v. State*, 523 S.W.2d 679, 680 (Tex.Cr.App.1975). See also *Dean v. State*, 749 S.W.2d 80, 82–83 (Tex.Cr.App.1988). *Gearing* was chosen for citation merely because it is the most succinct statement of this rule.

**13.** Appellant concedes that Dr. Simpson, a forensic pathologist who testified on behalf of the State, did refer to exhibits 50, 56, 57, 58, and 63 when discussing Mayfield's injuries. Appellant, however, argues that when Dr. Simpson was explaining the nature of the wounds, he relied upon diagrams of the human skull. Thus, according to appellant, Dr. Simpson did not actually use the photographs to aid his testimony. Instead, his testimony, as it concerned these photographs, was limited to identifying what was depicted in them.

by arguing that *Martin,* supra, permitted the admission of these photographs. We will begin by addressing the State's claims of waiver.

Relying on *Brown v. State,* 696 S.W.2d 913 (Tex.Cr.App.1985), the State contends that an objection to photographic evidence is waived if the same information contained in the photographs is conveyed to the jury in testimonial form. We feel that *Brown* is inapplicable to the instant case. In *Brown,* the defendant was tried for attempting to murder Ruiz. Oville, a person who tried to stop the altercation between the defendant and Ruiz, was also stabbed by the defendant. The defendant objected to the introduction of photographs which depicted the injuries received by Oville. The basis for the defendant's objection was that these photographs constituted proof of an *extraneous offense.* We found that the objection was waived because Oville showed his wounds in open court and told about the circumstances surrounding their infliction. Thus, the information which the defendant wished to keep from the jury, the existence of an extraneous offense, found its way to the jury through an alternate route. This case presents different situation.

 Here, appellant wished to keep the jury from knowing how the body looked on a mortuary slab. Although the testimony told the jury that Mayfield's body was taken to a mortuary, placed on the slab, and autopsied, it never related that Mayfield's face and body were caked with dried blood, that blood continued to drip from her body, collecting on the white slab and draining into a small reservoir, that her eyes were open and fixed, or that her jaw hung open and jutted to the right side. Dr. Simpson's testimony and the photographs deal with the same subject matter but do not convey the same graphic information. The waiver rule that the State would have us invoke does not apply to an objection to the gruesomeness of photographs unless the testimony itself is gruesome and conveys the aspects of the photographs which would be

likely to inflame the minds of jurors. We have found no case from this Court which applies the rule announced in *Brown* to an objection based on gruesomeness.

 The State argues that appellant waived this point of error because of his failure to adequately cite to the record in his brief. The State relies on *Hawkins v. State,* 613 S.W.2d 720 (Tex.Cr.App.1981).[14] In *Hawkins,* the defendant briefed a point of error alleging that the State had asked improper questions during jury voir dire. Because that defendant neither gave the names of the veniremen who were asked improper questions nor cited to the portion of the statement of facts where the questions could be found, this Court refused to review the point of error. *Hawkins,* supra at 734–35. Here, appellant identified the exhibits about which he was complaining and identified witnesses who did, or could have, used the photographs in their testimony. Appellant's brief satisfies the requirements of *Hawkins.*

 Finally, we turn to the merits of appellant's eighth point of error. The general rule for admission of photographs was set out by this Court in *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972).

> We hold that if a photograph is competent, material and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible.

*Id.* at 267 (footnotes omitted). We have repeatedly held that photographs of a dead body, taken before autopsy, are "competent, material, and relevant" when they depict the extent and nature of injuries.

> [R]elevant photographs [are not inadmissible] merely because the deceased has been removed to clinical surroundings.

14. The State also cites *Green v. State,* 682 S.W.2d 271 (Tex.Cr.App.1984). In *Green,* the defendant complained that his confession was improperly admitted. We refused to consider the point of error because the confession did not appear in the appellate record. If the photographs had not been included in the record, *Green* would be applicable.

Only where the results of surgery have obfuscated the results of the crime will otherwise accurate depictions be inadmissible. The photographs here in question illustrated and clarified the doctor's description of the injuries, and no error is reflected in their admission.

*Bailey v. State,* 532 S.W.2d 316, 322 (Tex. Cr.App.1975). See also, e.g., *Thomas v. State,* 701 S.W.2d 653, 660 (Tex.Cr.App. 1985); *Rumbaugh v. State,* 629 S.W.2d 747, 755 (Tex.Cr.App.1982). We find that these photographs had some probative value and were not introduced *solely* to inflame the jury. *Burdine v. State,* 719 S.W.2d 309, 317 (Tex.Cr.App.1986); *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). Appellants eighth point of error is overruled.

In his ninth point of error, appellant argues that the trial judge should not have admitted testimony concerning the high school activities of the deceased. The following occurred at trial.

[Questions by prosecutor]

Q: Was she ever involved in activities such as homecoming and that type of thing?

MR. MARSH: Objection with respect to relevancy.

THE COURT: Overruled.

Q: Sir?

A: Can I answer the question?

Q: Was she involved in homecoming activities or anything like that?

A: Yes, sir. She was homecoming queen twice. She was a drum major. She was also voted most beautiful girl two years.

Appellant contends that the State may not introduce evidence of a deceased's good character unless it is in rebuttal to a defendant's attack on the character of the de-

ceased or an assertion that the deceased was the first aggressor. Appellant never attacked Mayfield's character nor did he claim self-defense or provocation. The State contends that appellant's argument on appeal is different from his trial objection and that if there was error, the error was harmless.

The rules and policies concerning specificity of objections are set out in *Zillender,* supra.[15]

The generally acknowledged policies of requiring specific objections are two-fold. First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony. In accordance with these policies, a number of exceptions to the general rule that a party cannot complain on appeal to the overruling of a general objection or an imprecise specific objection have been created. Thus, where the correct ground of exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection.

Id. at 517 (citations and footnotes omitted). Thus, our inquiry on waiver will focus on whether "Objection with respect to relevancy" made it obvious to the judge and State that appellant was invoking the general rule that the State may not prove the good character of the deceased.

Although this case was not tried under the new Rules of Criminal Evidence, the placement of relevance and character of the deceased in separate rules indicates that these are similar, but distinct, issues.[16] Thus, a relevancy objection and an objection to an improper use of character evidence are very different things. We find

---

**15.** See current Tex.R.App.Pro. 52(a).

**16.** The definition of "relevance" is set out in Rule 401. Rule 402 prohibits admission of irrelevant evidence. And, Rule 404 delineates the proper uses of character evidence. Rules 401 and 402 are universal—they apply to every piece of evidence which might be admitted. Rule 404, on the other hand, is very specific—it ap-

plies only to character evidence. A close reading of Rule 404 indicates that all such character evidence has a certain degree of probative value; however, courts have traditionally limited the use of character evidence because it tends to be more persuasive to jurors than courts feel it should be. E. Cleary, McCormick on Evidence 549–51 (3d ed.1984).

that appellant's objection did not put the judge and the State on notice that appellant was asserting that the testimony was an improper use of character evidence. Thus, this point of error was waived because the objection was imprecise or general within the meaning of *Zillender,* supra. Appellant's ninth point of error is overruled.

In his eleventh point of error, appellant argues that he is entitled to a new trial because the State sought to discredit Dr. Wendell Dickerson, a licensed psychologist and one of appellant's expert witnesses during the punishment phase, by asking him questions about another capital murder case in which he testified on behalf of the defendant. The questioning transpired as follows:

[Questions by Mr. Little, prosecutor]

Q: Dr. Dickerson, I believe we've met under somewhat similar circumstances, haven't we?

A: That's entirely correct. It's a pleasure to see you again.

Q: Thank you. Same here. I believe you testified for the Defense in a capital murder case involving David DeBlanc in Liberty County last September; is that right?

A: I never did know the defendant's name.

Q: He was the man who robbed and murdered a Catholic priest up in Ames?

A: That's correct.

The State responds that appellant waived any error by failing to object and that, if this point was preserved, the question and answer were not error, and, if error, the error was harmless.

▇▇▇▇ In support of its contention that appellant waived error, if any, the State cites *Thomas v. State,* 530 S.W.2d 834, 837 (Tex.Cr.App.1975), for the proposition that if a party fails to object to a question, nothing, with regard to that question is presented for appellate review. We agree with the State's assessment of *Thomas,* supra. Because there was no objection, we have no trial court ruling to review. *Id.* See also *Purtell v. State,* 761 S.W.2d 360, 365–367 (Tex.Cr.App.1988);

*Perry v. State,* 703 S.W.2d 668, 670–71 (Tex.Cr.App.1986). Appellant anticipated the State's waiver argument in his brief and cites *Romo v. State,* 631 S.W.2d 504, 505–06 (Tex.Cr.App.1982), for the proposition that, if an instruction to disregard would not cure an error, then no objection is necessary. *Romo,* supra, is not applicable to the instant case. Excusing a defendant from objecting in certain circumstances is rooted in the idea that the unobjected error is fundamental. See *Perry v. State,* 703 S.W.2d 668, 671–72 (Tex.Cr.App.1986). See also Tex.R.Crim.Evid. 103(d) (not in effect at time of appellant's trial); Marshall, *Preserving the Record and Judicial Notice,* in 1 State Bar of Texas Advanced Criminal Law Course H–19–20 (1988); Wellborn, *Article I of the Texas Rules of Evidence and Articles I and XI of the Texas Rules of Criminal Evidence: Applicability of the Rules, Procedural Matters, and Preserving Error,* 18 St. Mary's L.J. 1165, 1184–85 (1987). Because the alleged error is neither fundamental nor derived from a specific legislative enactment, appellant's failure to object is an absolute waiver, and it is irrelevant whether or not an instruction to disregard would have cured the error. Appellant's eleventh point of error is overruled.

In his fifteenth point of error, appellant argues that admission of testimony from Barbara Mayfield's brother and A.H. concerning the impact of the offense constituted a violation of his Eighth Amendment rights and is prohibited by the Supreme Court's opinion in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The State counters that appellant's failure to object waived error and that *Booth* is distinguishable from the instant case. We agree that there was waiver and will not address the merits of appellant's claim.

When the testimony that appellant now complains of was given, appellant did not object. The State cites a number of cases which hold that a failure to object to the introduction of evidence waives that point of error for appellate purposes. E.g., *Thomas,* supra; *Granviel v. State,* 552

S.W.2d 107, 121 (Tex.Cr.App.1976), *cert. denied* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). See also point of error eleven, supra. While these cases are applicable, appellant counters that, because *Booth* was decided after his trial, failure to object at that time does not constitute a waiver. Because of this argument by appellant, we will decide this issue based on *Ex parte Chambers*, 688 S.W.2d 483 (Tex.Cr.App. 1985). A holding in *Chambers* sets out the test which determines when a judicial decision, decided subsequent to a defendant's trial, relieves that defendant from making a contemporaneous objection.

> This Court has for at least twelve years held that a defendant has not waived his right to assert a constitutional violation by failing to object at trial if at the time of his trial the right had not been recognized.

*Chambers,* supra at 486 (per Campbell, J. concurring, joined by W.C. Davis, Clinton, McCormick, Teague, and Miller, JJ.)

■ In *Booth,* the Supreme Court predicated its decision on the Eighth Amendment's guarantee that the death penalty will not be applied in an arbitrary manner. *Booth,* supra at 107 S.Ct. 2535–36. The right to be free from arbitrary or capricious capital sentencing has been recognized, at least, since *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 883 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), *reh. denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976), and *California v. Ramos,* 463 U.S. 992, 999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171, 1179 (1983). See *Booth,* supra at 107 S.Ct. 2532. In addition to the Eighth Amendment rights recognized in *Gregg,* supra, and *Ramos,* supra, the Supreme Court engaged in analysis of the probative value of victim-impact evidence versus its likelihood of unfairly inflaming the minds of jurors. *Booth,* supra at 107 S.Ct. 2535–36. This type of evidentiary analysis has long been a part of Texas jurisprudence. See, e.g., Tex.R.Crim.Evid. 403; *Albrecht v. State,* 486 S.W.2d 97, 99–100 (Tex.Cr.App.1972); *Bryant v. State,* 99 Tex.Cr.R. 600, 271 S.W. 610, 612 (App. 1925). The Supreme Court's holding in *Booth* did not create a previously unrecognized right. Thus, the holding in *Chambers* discussed ante does not excuse appellant from the procedural duty to preserve error by making a contemporaneous objection. Appellant's fifteenth point of error is overruled.

■ In his twelfth point of error, appellant claims that the prosecutor's closing argument during the punishment phase of his trial was improper because it injected new and harmful facts. The prosecutor said:

> He [appellant] didn't care one fig what he did to them. Not one. You know how you can see that? Because when he carelessly tossed the body of Barbara Harrington Mayfield into those weeds on Hebert Road, he tossed something else out after her. Look at the shoe without the hole. The shoe she couldn't put on. The shoe she didn't wear to where she lay dying on Hebert Road. Who tossed it there? Who threw it there? Who threw it out of the car?

Appellant contends that the evidence never directly established that appellant put the shoe where it was found and that such an inference is also unsupported by the evidence. The State responds that appellant waived error by failing to object and, alternately, that the statement was a reasonable inference from the evidence. We find that appellant's failure to object waived this point of error.

Generally, if a defendant fails to object to improper argument by a prosecutor, the error is waived. An exception, however, exists for arguments that are so prejudicial that an instruction to disregard would not be effective. E.g., *Briddle v. State,* 742 S.W.2d 379, 389 (Tex.Cr.App.1987). C.f. *Thomas v. State,* 530 S.W.2d 834, 837 (Tex. Cr.App.1975) (no exception when issue is improperly admitted evidence). Therefore, we will determine whether an instruction to disregard would have cured the argument of which appellant complains.

The instant argument suggested that the jury could infer that appellant did not care about the well-being of his victims because

he "tossed something else out after [Mayfield]." First, we are not sure how appellant's act of throwing Mayfield's shoe out into the weeds where the body was found proves a particular disregard of the victims' well-being. Second, appellant's acts of rape, abduction, robbery, murder, and attempted murder suggest a certain disregard for his victims. Given appellant's actions, the prosecutor's statement about the shoe could not have contributed to the strong impression that, at least on the night of the offense, appellant was not concerned about the welfare of A_____ H_____ or Mayfield. And, if the argument had any incremental effect on the jury's beliefs concerning this issue, an instruction to disregard would have easily cured the error. Because an instruction to disregard would have cured any harm that might have occurred, appellant was under a duty to object at the time of the argument. Appellant's twelfth point of error is overruled.

■■ In his second point of error, the appellant contends that the trial court erred in failing to define the term "deliberately" in the court's instructions to the jury at the punishment phase. This Court has repeatedly held that, because the term "deliberately" has not been defined by statute, the term is to be understood in light of common usage and need not be defined in the charge to the jury on punishment.[17] E.g., *Demouchette*, supra at 80. Point of error two is overruled.

■■ In his fourth point of error, appellant argues that the trial judge's refusal to grant a requested jury instruction at the punishment phase, concerning voluntary intoxication as mitigation of punishment, was reversible error. Appellant's proposed instruction stated:

> You can consider, in mitigating or lessening the defendant's punishment, that at the time of the murder, that capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was impaired as a result of voluntary intoxication.

The State responds that the evidence adduced was insufficient to support such an instruction. Rather than conduct a review of the evidence to support this instruction, we find that, regardless of the evidence presented, appellant was not entitled to the requested instruction. This Court has repeatedly held that, although a capital murder defendant has a right to have certain evidence considered in mitigation of punishment, he is not entitled to jury instructions specifically informing the jury that certain evidence may be considered or how it may be applied. E.g., *Cordova v. State*, 733 S.W.2d 175, 190 (Tex.Cr.App.1987); *Demouchette*, supra at 80.

> Appellant was entitled to present evidence of any mitigating circumstances and did present such evidence.... The question then is whether the language of the special issue is so complex that an explanatory charge is necessary to keep the jury from disregarding the evidence

---

17. We have also repeatedly urged the Legislature to provide a statutory definition for "deliberate," and until the Legislature acts on this issue, we have opted not to intrude into the legislative domain. *Nichols v. State,* 754 S.W.2d 185, 201 n. 17 (Tex.Cr.App.1988); *Lane v. State,* 743 S.W.2d 617, 628 n. 7, 630 n. 11 (Duncan, J., concurring) (Tex.Cr.App.1987); *Williams v. State,* 674 S.W.2d 315, 322 n. 6 (Tex.Cr.App. 1984). The dissent fails to address the policy concerns which underlie our continuing deference to the Legislature in this matter. Instead, it merely asserts that this Court has the *power* to provide a definition. Having the power to act does not necessarily mean that action is desirable.

Because the question of defining "deliberately" is one of statutory construction, it is of paramount importance that we bind ourselves through stare decisis.

> "[T]he Legislature must be regarded as intending statutes, when repeatedly re-enacted [sic], as is the case here, to be given that interpretation which has been settled by the courts."
> .... We have not yet adopted the theory that the Legislature's non-action authorizes judicial action in legislative matters.

*Marmon v. Mustang Aviation, Inc.* 430 S.W.2d 182, 187 (Tex.1968) (citations omitted). While Art. 37.071 has not been reenacted, as had the wrongful death statute interpreted in *Marmon,* the Legislature has continually left the term "deliberate" undefined, a prerogative upon which we choose not to encroach.

properly before it. In *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978), this Court held that the questions in Art. 37.071 used terms of common understanding which required no special definition. The jury can readily grasp the logical relevance of mitigating evidence to the [special] issue[s]....

*Quinones v. State*, 592 S.W.2d 933, 947 (Tex.Cr.App.1980), *cert. denied*, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121, *reh. denied*, 449 U.S. 1027, 101 S.Ct. 600, 66 L.Ed.2d 490 (1980). Appellant's fourth point of error is overruled.

Having considered the appellant's points of error and finding no reversible error, we affirm the judgment of the trial court.

MILLER and DUNCAN, JJ., concur in result.

CLINTON, Judge, dissenting.

In *Jurek v. State*, 522 S.W.2d 934 (Tex. Cr.App.1975), the question before the Court was whether former article 1257, P.C. (1925), as amended by Acts 1973, 63rd Leg., Ch. 426, p. 1122, and Article 37.071, V.A.C. C.P., are "valid" under the holding in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). More particularly, the Court, through the late Judge W.A. Morrison, asked itself three leading questions, *viz:*

Do they provide effective guidance to the jury?

Do they adequately limit the discretion of the jury?

Do they guard against the arbitrary and standardless imposition of the death penalty?

*Id.*, at 938. Upon examining the statutes the Court would quickly answer each question in the affirmative.

After commenting on restricted circumstances under which the State may seek the death penalty, the Court was satisfied that Article 37.071 "further limits the standardless imposition of the death penalty," *viz:*

"... It limits the jury's discretion on the range of punishment to life imprisonment or death. A jury may no longer choose from a range of two years to life to death. Further, in order to impose the death penalty, the jury must find beyond a reasonable doubt and must respond affirmatively to two or three questions, depending on the circumstances. These questions direct and guide their deliberations. They channel the jury's discretion on punishment and effectively insure against the arbitrary and wanton imposition of the death penalty."

*Id.*, at 939. Although those findings might have disposed of the issue, the Court went on to a subsidiary assertion.

Addressing a contention that Article 37.-071 is "too vague to provide adequate guidance to the jury," the Court took the position that "factors which determine whether the sentence of death is an appropriate penalty in a particular case are too complex to be compressed within the limits of a simple formula." However, it did identify some "viable factors for the jury's consideration;" but each pertains just to special issue two: "determining the likelihood that the defendant would be a continuing threat to society." *Id.*, at 939–940. The Court did not mention special issue one.

Returning to the matter of discretion, the Court waxed philosophically about "the quality of discretion and the manner in which is applied," to conclude:

"... If discretion in the assessment of punishment can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* will be met."

Upon "considerable reflection," the Court found the statutes "do meet this test." *Id.*, at 940. Then it moved on to consider unrelated grounds of error.[1]

---

**1.** Presiding Judge Onion concurred in the results. Judges Odom and Roberts dissented separately: the former on effect and meaning of the statute, especially vagueness of special issue two; the latter went further to find that issue unconstitutional. Neither specifically addressed the first special issue. *Jurek,* at 943 and 946, respectively.

*Jurek v. State* was decided April 16, 1975, and rehearing was denied without written opinion May 7, 1975. So far as indicated in Shepard's Texas Citations, except in a general way such as habeas bail cases, e.g., *Ex parte Wilson*, 527 S.W.2d 310 (Tex.Cr.App.1975), the Court was not called on to construe special issue one before *Jurek* was submitted on oral argument to the Supreme Court of the United States on March 30, 1976. (*Smith v. State*, 540 S.W.2d 693, 697 (Tex.Cr.App.1976), had been decided February 18, 1976, but it addressed special issue one summarily to reject a contention that the issue is not applicable to one charged as "principal," *id.*, at 697, and was pending on rehearing.) Thus, *sans* edifying judicial interpretation, the advocates mainly had to argue from the face of the statutes. See 19 CrL 4005.

For Jurek, as pertinent here, Anthony Amsterdam charged that "the judge in effect invited the jury to decide that the defendant should be executed and instructed them how to reach that result through the interrogatories;" he asserted that "*the first and third were, of necessity, already answered at the guilt phase.*" Amsterdam added that "the interrogatories themselves are meaningless. The jury has unfettered power to make the life or death decision, and adequate appellate review is impossible." *Id.*, at 4006.[2]

For the State of Texas, then Attorney General John Hill was making an emotional appeal for leaving to the people of Texas "the means of taking care of such a [particularly brutal and callous] crime," admonishing the Supreme Court that it "is not the keeper of the social values, the conscience, the moral values of the people," when Justice Stevens asked him "to address the objections Amsterdam made to the three interrogatories considered by the jury in the punishment phase."

In his response General Hill used as an example a capital murder case arising out of what is surely the 1974 Orange County jail break attempted by Clifford S. Blansett and Billy Wayne Dowden that would later come before the Court in, e.g., *Blansett v. State*, 556 S.W.2d 322 (Tex.Cr.App.1977). After summarizing the factual situation, Hill pointed out and argued:

"... The jury convicted the defendant of first-degree murder and had no trouble finding the requisite intent. But in the punishment phase the jury determined that the defendant *did not have the intent required by the first interrogatory.* This example makes clear that *the interrogatories do not, as Amsterdam charged, merely repeat issues already decided.* The cases show *a real basis* for distinguishing among defendants; it is not simply jury prejudice."

*Id.*, at 4007.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), delivered July 2, 1976, the Supreme Court did not settle the argument. Instead, in the vernacular, it punted, *viz:*

"The Texas Court of Criminal Appeals has not yet construed the first and third questions ...; thus it is as yet undetermined whether those questions would properly include consideration of mitigating circumstances. In at least some situations the questions could, however, comprehend such an inquiry. * * * * We cannot, however, construe the statute; that power is reserved to the Texas courts."

*Id.*, n. 7, at 272, 96 S.Ct., at 2956.[3]

The judicial quest for meaning of "deliberately" as used in Article 37.071(b)(1)

---

2. All emphasis is mine throughout unless otherwise noted.

3. In the wake of *Jurek v. Texas* the Court decided several other capital cases in 1976, and in several it seems to regard an affirmance by the Supreme Court as carte blanche to reject out of hand constitutional challenges, e.g., *Gholson v. State*, 542 S.W.2d 395, at 397 (Tex.Cr.Ap.1976), and *White v. State*, 543 S.W.2d 104, at 105 (Tex.Cr.App.1976); but except for *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), none directly implicated the first special issue. It had no impact on the majority opinion in *Smith v. State*, supra, at 697 (issue applicable to a "principal" and evidence sufficient to support affirmative finding to special issue one); however, in light of *Jurek*, et al., Judges Odom and Roberts withdrew their respective opinions questioning constitutionality of the statutory scheme. See *Smith*, at 700.

probably began in *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976), and would blaze a trail of twists and turns such as to create a veritable maze. Although years ago the Court had accepted its "well-defined meaning" in context of a perjury indictment, *Ferguson v. State,* 36 Tex. Cr.R. 60, 35 S.W. 369 (1896), the Court never alluded to that definition of "deliberately." [4]

The claim in *Granviel* was that the evidence is insufficient to support an affirmative answer to special issue one because it did not show the killing in question was "the result of any 'premeditation' or deliberation," in that the killing "had none of the characteristics of a 'weighed', 'pondered upon' act because it 'occurred in a frenzy'." *Id.,* at 122–123. The Court, speaking through Judge Thurman M. Gupton, found otherwise, *viz:*

> "... We do not agree with appellant's interpretation of Art. 37.071(b)(1), supra. The statutory requirements that appellant's conduct be committed *deliberately* does not mean that it must be a *premeditated* act. There is sufficient evidence in the record from which jury could conclude that when appellant deliberately stabbed and bound two year old Natsha nine times as she lay on the floor and the bed, he could reasonably expect that her death would result."

*Id.,* at 123 (emphasis by Judge Gupton).[5]

In *Brown v. State,* 554 S.W.2d 677 (Tex. Cr.App.1977), reminiscent of Anthony Amsterdam's charges before the Supreme Court, see *ante,* at 104, the constitutional contention is that the statute denies "the right to an impartial jury in assessing punishment because Article 37.071(b)(1) and (3)

require the same finding as a finding of guilt under Article 19.03, Texas Penal Code." *Id.,* at 678. Reprising what the Supreme Court had to say about the Court not yet construing those questions, *ante,* at 104, the Court pointed to its general findings in *Jurek, ante,* at 103, and rejected the contention, *viz:*

> "We hold that the punishment issues enumerated in Article 37.071(b)(1) and (3) serve the purpose of guiding the jury's punishment deliberations and do not deny a defendant the right to an impartial jury in assessing punishment."

*Id.,* at 679. Professor Amsterdam meet Judge Truman Roberts.

Having thus refuted Amsterdam in *Brown,* in a supremely ironic turn of events the Court, perhaps unwittingly, disabused Attorney General Hill in, of all cases, *Blansett v. State,* supra, *viz:*

> "... [T]he provisions of V.T.C.A. Penal Code, Sec. 19.03(a) and Art. 37.071(b)(1), V.A.C.C.P., are inconsistent; a jury having found that a defendant *intentionally* committed a capital murder to be consistent *would have to find* that the act was *deliberately* done. However, the inconsistent answer to the question Art. 37.071(b)(1) reflects only that *the jury did not want the death penalty assessed.*"

556 S.W.2d, n. 6, at 327.

So far, then, the Court has said that "deliberately" does not mean "premeditatedly," that it is used in its "ordinary meaning," that it is not the same as a jury finding of "intentionally" on guilt but that to be consistent a jury would have to find that an "intentional" act is "deliberately

---

**4.** By common law and statute then in effect perjury was "a false statement, *deliberately and willfully* made [et cetera]." *Id.,* at 369. In the course of its discussion the Court contrasted the meaning of "deliberately" and "willfully," approving a "well-defined" meaning of the former, *viz:*

> "'Deliberately' means 'with careful consideration or deliberation; with full intent; not hastily or carelessly,—as a deliberately formed purpose.'"

*Id.,* at 370.

**5.** Shortly thereafter, as to defining the term "deliberately" and others in court's charge on punishment, the Court saw no need because they are "words simple in themselves, and are used in their ordinary meaning, [so] jurors are *supposed to know* such common meaning and terms," and thus "are not *necessarily* to be defined in the charge ...," quoting *Joubert v. State,* 136 Tex.Cr.R. 219, 124 S.W.2d 368, at 369 (1939). *King v. State,* 553 S.W.2d 105, at 107 (Tex.Cr.App.1977).

done." Over the next few years the Court goes deeper into the maze.[6]

Not until confronted directly with the fact that a jury gave a negative answer to special issue one and a claim that " 'deliberately' as used in the first punishment issue ... is the linguistic equivalent of 'intentionally' and 'knowingly'," *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981), did the Court try to find its way out, *viz:*

"The presumption is that in enacting a statute, the Legislature intends the entire statute to be effective. [citations omitted]. Moreover, it must be presumed that the Legislature did not intend to do useless thing in the enactment of a statute. [citation omitted].

If this Court were to adopt appellant's argument that deliberately and intentionally or knowingly were linguistic equivalents, it would render Art. 37.071(b)(1), supra, a nullity. Under such a holding Art. 37.071(b)(1), supra, would be a useless thing in that a finding of an intentional or knowing murder would be irreconcilable with a finding that the defendant's conduct was not committed deliberately. We will presume that *the Legislature would not have enacted Art. 37.071(b)(1), had it intended for a finding of deliberateness to be based on the same standard as that of intentional or knowing.*"

*Id.*, at 552–553. Still it was not error to fail to so inform a jury. *Hawkins v. State*, 660 S.W.2d 65, at 81 (Tex.Cr.App.1983).

*Heckert v. State*, supra, begat *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1981)

(Opinion on Rehearing), in treating sufficiency of evidence to show "deliberately," *viz:*

"... [W]e now know that 'deliberately,' as used in that question on punishment, is not the linguistic equivalent of 'intentionally,' as used in the charge on guilt-innocence. *Heckert v. State*, [supra]; rather it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct.[6] * * * *

_____

6. The person who engages in certain conduct deliberately has upon consideration said to himself, 'Let's do it.' Still conduct committed 'deliberately' need not be 'premeditated.' As explained in Black's Law Dictionary (Fourth Rev.Ed.1968) at 1343:

'Premeditation differs essentially from *will* which constitutes the crime; because it supposes, besides an *actual* will, a *deliberation* and a *continued persistence.*' [Emphasis in original]."

*Id.*, at 584. See *Rumbaugh v. State* 629 S.W.2d 747, at 754 (Tex.Cr.App.1982) (evidence sufficient, see *Milton* ).

In *Russell v. State*, 665 S.W.2d 771 (Tex. Cr.App.1983), accused requested a special requested charge on the first issue. However, it defined both "deliberate" and "premeditated," and would have instructed the jury that a killing resulting from "deliberation *and* premeditation" is "deliberate," elaborating on that concept. *Id.*, at 779–780. The Court found the trial court did not err in refusing the requested charge essentially for two reasons: first, on account of the holding in *King v. State*, supra, see note 5, *ante;* second, in that both *Granviel* and *Fearance* differentiated "deliberately" and "premeditatedly," the re-

_____

6. As its decisions demonstrate, the Court would resort to one or another such notion—or none—depending on the issue presented.

On voir dire examination, a trial judge did not abuse his discretion in refusing to permit defense counsel to explore the matter by ruling that "deliberately" is "what it means to [a venireperson]," *Chambers v. State*, 568 S.W.2d 313, at 323 (Tex.Cr.App.1978), or that it does not have a "statutory definition or meaning," and thus is to be taken and understood in common language, *Esquivel v. State*, 595 S.W.2d 516, at 525–26 (Tex.Cr.App.1980); see also *Milton v. State*, 599 S.W.2d 824, at 826 (Tex.Cr.App.1980) (refusal not abuse of discretion).

As to sufficiency of evidence, without any effort for definitiveness the Court routinely upheld an affirmative answer: *Duffy v. State*, 567 S.W.2d 197, at 209 (Tex.Cr.App.1978) (See *Granviel*, supra); *Bodde v. State*, 568 S.W.2d 344, at 351 (Tex.Cr.App.1978); *Villarreal v. State*, 576 S.W.2d 51, at 65 (Tex.Cr.App.1978); *Wilder and Armour v. State*, 583 S.W.2d 349, at 356–357 (Tex.Cr.App.1979) (Armour culpable as party with *Wilder* ); *Ex parte Alexander*, 608 S.W.2d 928, at 930–931 (Tex.Cr.App.1980) ("proof evident" by obtaining and loading weapon in anticipation of return of victim).

The problem of instructing the jury on meaning of the term was not raised during this early period.

quested charge "would not have been proper." *Id.,* at 780.[7]

Despite an emerging awareness that "deliberately," as used in special issue one, is not the "same standard" as that of "intentionally" in the authorization charge on guilt, *Heckert* and *Russell,* supra, the Court continued to reject efforts to enlighten juries to that fact. See, e.g., *Williams v. State,* 674 S.W.2d 315 (Tex.Cr.App.1984), wherein four members of the Court recorded their agreement that upon request the jury should be properly instructed as to meaning of "deliberately." *Id.,* n. 6, at 322.[8]

In *Morin v. State,* 682 S.W.2d 265, at 270 (Tex.Cr.App.1983), it found no error in refusing a requested definition of "deliberately," by misreading the issue in *Heckert,* supra, and merely reciting the first holding in *King v. State,* and alluding to *Russell v. State,* supra; but see opinion dissenting to denial of motion for rehearing, at 270–271.[9]

---

**7.** The dissenting opinion first considered "whether the word 'deliberately' had taken on in any material fashion a 'special definition,'" *id.,* at 782, and after tracing some of the above developments, concluded that it has "in the sense enunciated in *Heckert,*" that is, "deliberately" is neither the linguistic nor connotative equivalent of "intentionally." *Id.,* at 784. Then, considering "whether in this point in the evolution of our capital murder law, [there is] any compelling reason to require that 'deliberately' be defined [for] the jury at punishment," for reasons given at 785–787, the writer urged the Court to act accordingly, *viz:*

"... [W]e should now employ that power reserved to us by the Supreme Court in *Jurek* [notes omitted throughout], supra, and hold that upon timely request by a capital murder defendant or the State, that party is entitled to have the jury instructed at the punishment phase to the effect of the following:

(1) as employed in the first special issue, the word "deliberately" has a meaning different and distinct from the word "intentionally," as that word was previously defined in the charge on guilt, and

(2) instead, as employed in the first special issue, the word "deliberately" means a manner of doing an act characterized by or resulting from careful and thorough consideration; characterized by awareness of the consequences; willful, slow, unhurried, and steady as though allowing time for a decision."

*Id.,* at 787. See Webster's New Collegiate Dictionary, G. & C. Merriam Co. (1979). But see *Smith v. State,* 676 S.W.2d 379, at 393 (Tex.Cr. App.1984) (proof need not show accused "carefully weighed or considered" or "studied" situation), and *Selvage v. State,* 680 S.W.2d 17, at 21–22 (Tex.Cr.App.1984) (pro forma).

**8.** In overruling a point of error complaining that the trial judge precluded defendant from presenting evidence to the jury as to his deliberateness, the Court opined that "a distinction between intentional and deliberate would indeed have been helpful to the jury, especially ... in light of the prosecutor's voir dire (to which no objections were lodged) that equated *deliberately* and *intentional* as synonymous terms." *Id.,* at 320 (emphasis in original).

Also rejected was a claim that special issue one has been rendered unconstitutional by judicial interpretation so limiting the deliberateness issue as to preclude "proper consideration of mitigating circumstances." In that connection the Court found the issue has caused "some confusion," whereas the plurality went further in note 6, *viz:*

"Trial courts, attorneys and jurors have evidenced much confusion and conflict over different interpretations of the common meaning of *deliberate* within the context of a capital murder punishment hearing. While a majority of the Court does not agree, four judges ... do agree that upon timely request by a capital murder defendant or the State, that party is entitled to have the jury instructed at the punishment phase that:

(1) as used in the first special issue, the word 'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge on guilt and

(2) the word 'deliberately' as used in the first special issue means a manner of doing an act characterized by or resulting from careful consideration: 'a conscious decision involving a thought process which embraces more than mere will to engage in the conduct.'

See *Fearance v. State,* 620 S.W.2d 577, 584 (opinion on appellant's motion for rehearing 1981)."

*Id.,* at 322, n. 6 (emphasis in original).

**9.** Quaere:

"If in 1977 the members of this Court believed 'deliberateness' was the same thing as 'intentional,' all the collective legal training notwithstanding, how can we any longer seriously suggest that jurors, without the least bit of assistance, will, in every case *not* apply it the same way as *Blansett*—a way *Heckert* now acknowledges would be unconstitutional?"

*Id.,* at 271 (emphasis in original).

To be noted in this regard is that the Court went through much the same enlightenment in the matter of the law of parties *vis a vis* special issue one. Compare *Wilder v. State,* supra, 583 S.W.2d, at 356–357, with *Meanes v. State,* 668 S.W.2d 366, 375–376 (Tex.Cr.App.1983), and

In like vein a majority rejected a contention in *Stewart v. State*, 686 S.W.2d 118 (Tex. Cr.App.1984), that, having found he acted "intentionally" in relation to the homicide, the jury was precluded from considering mitigating circumstances, including evidence that he was not the triggerman, in answering special issue one. Noting there was conflicting evidence on the point, that "deliberately" is not linguistically equivalent to "intentionally" but need not be defined (reciting the usual litany of cases), that "we cannot tell from the record that the jury did *not* consider the mitigating factors," that "the jury was given the freedom to construe 'deliberately' as they understood it to be commonly used," and that defendant has not shown "the jury *did* construe 'deliberately' as the equivalent of 'intentionally or knowingly,'" the majority "decline[d] to assume they did." *Id.*, at 121–122 (emphasis in original).[10] To same effect is *Penry v. State*, 691 S.W.2d 636, at 653–654 (Tex.Cr.App.1985), as well as the concurring opinion.[11]

A charge issue was not raised in *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App. 1985), but in testing sufficiency of evidentiary support for an affirmative answer to special issue one, the Court noticed that

acts of repeatedly stabbing a victim were held sufficient in *Granviel v. State* and *Duffy v. State*, both supra. However, it also pointed out that in *Fearance v. State*, supra, the Court said that deliberately is "the thought process which embraces more than a will to engage in conduct and activates the intentional conduct." Accordingly, the Court explained:

"... Thus, while from the act of suddenly and impulsively firing a gun can be found the intent to cause the death, such action may not necessarily show the act was deliberate. To find the act of deliberateness there must be the moment of deliberation and the determination on the part of the actor to kill. Such determination must necessarily be found from the totality of the circumstances of the individual case."

*Id.*, at 677. Thus once again the Court confirms a special distinction between "intentionally" and "deliberately," and analyzes the evidence in that light.[12]

In *Marquez v. State*, 725 S.W.2d 217 (Tex.Cr.App.1987), a trial court did give the jury a definition along the lines indicated in *Fearance v. State*, supra, at 584, and as suggested in *Williams v. State*, supra, n. 6,

concurring opinion, at 376–378, adopted by the Court in *Green v. State*, 682 S.W.2d 271, at 287 (Tex.Cr.App.1984).

**10.** Arguing that "no party has a 'burden of proof' in this matter [of mitigation]," and that the State of Texas does have a duty to ensure due process generally, including *inter alia*, "that the jury is given adequate guidance in its deliberations specifically," the dissenting opinion points out past failures in that respect, *viz:*

"... [A] majority of this Court has blithely said, time and again, that in considering whether to impose a death sentence the jury must be allowed to consider whatever mitigating circumstances the defense can bring before it. But they also have repeatedly denied the utility, much less necessity, of informing the jury that they *may* so consider the evidence."

*Id.*, at 126.

**11.** The gist of which is in the following comments:

"As used in the first special issue, the word 'deliberately' is not 'simple in meaning,' as the continuing debate between lawyers, scholars and judges over its meaning and import well attests.

It is inconceivable to me that the Court has acknowledged the jury's failure to differentiate 'deliberately' from 'intentionally' would constitute denial of due process, see *Heckert v. State*, [supra], yet continues to refuse to require as matter of course that the jury be informed 'distinctly [of] the law applicable to the case.' Article 36.14, V.A.C.C.P., in this regard."

*Id.*, at 657.

**12.** Contemporaneously, however, the Court clung to the notion that a requested definition to that effect is not required to enable a jury to make a proper analysis of the evidence concerning deliberateness. *Cordova v. State*, 698 S.W.2d 107, at 113 (Tex.Cr.App.1985); *East v. State*, 702 S.W.2d 606, at 615 (Tex.Cr.App.1985). It also found sufficient evidence in *Cordova v. State*, supra (under *Enmund v. Florida* [458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)]); *Santana v. State*, 714 S.W.2d 1, at 5–6 (Tex.Cr. App.1986) (following *Selvage v. State*, supra); *Carter v. State*, 717 S.W.2d 60, at 66–67 (Tex.Cr. App.1986) (using common meaning of "deliberately," not whether defendant "carefully weighed or considered or carefully studied situation").

at 322.[13] And the Court seems to chide the judge for doing so, *viz:*

> "Thus, *notwithstanding this Court's stance* on the issue of whether or not the jury should be instructed on the difference between 'deliberate' and 'intentional' [citations omitted], appellant has no room to complain. Regardless of his belief that generally the terms are understood by juries to have similar meanings, *this jury was specifically instructed that they do not.*"

*Id.,* at 244. There is a valuable lesson to be learned here.

*Rector v. State,* 738 S.W.2d 235 (Tex.Cr. App.1986), discusses several aspects of special issue one. First it reaffirms that the law of parties may not be applied; that is, "the State may not rely on evidence that another with whom the defendant was acting acted deliberately and with a reasonable expectation that death would result;" instead, "the jury must determine whether [defendant's] own culpable conduct which contributed to the deceased's death was committed deliberately and with the reasonable expectation that death would result." *Green v. State,* 682 S.W.2d 271, at 287 (Tex.Cr.App.1984). Next, the Court restates a measure of proof, *viz:*

> "Proof of deliberateness does not mean that the murder must be premeditated. *Granviel v. State,* 552 S.W.2d 107, 123 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). 'To find the act of deliberateness, there must be the moment of deliberation and the determination on the part of the actor to kill.' *Cannon v. State,* 691 S.W.2d 664, 677 (Tex.Cr.App.1985)."

*Id.,* at 242. Finally, upon analyzing the evidence the Court finds it sufficient to support an affirmative finding. *Id.,* at 243.

In *Livingston v. State,* 739 S.W.2d 311 (Tex.Cr.App.1987), responding to evidentiary contentions that "repetitiveness" on part of defendant was not shown and that a struggle with his robbery victim "caused Appellant to do something that he had no intention of doing when he first approached [her]," *id.,* at 338, the Court touched all bases of "deliberately," *viz:*

> "The term 'deliberately' is not defined by statute and is therefore to be taken and understood in common everyday language. *Rector v. State,* supra; *Stewart v. State,* 686 S.W.2d 118 (Tex.Cr.App. 1984). Thus, we do not require the State to prove that the killing was premeditated or that the defendant carefully weighed or analyzed the situation before killing the deceased in order to support a finding that he acted deliberately. *Rector v. State,* supra; *Kunkel v. State,* supra [771 S.W.2d 435 (1986)] [pending certiorari]; *Smith v. State,* supra; *Granviel v. State,* supra. On the other hand, 'deliberately', as used in the first special issue, is not the linguistic equivalent of 'intentionally', as used in the charge on guilt-innocence. *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1981); *Heckert v. State,* 612 S.W.2d 549 (Tex.Cr. App.1981). Rather, 'it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct.' *Fearance v. State,* 620 S.W.2d at 584. To this end, 'there must be the moment of deliberation and the determination on the part of the actor to kill,' as found 'from the totality of circumstances of the individual case.' *Cannon,* supra."

*Id.,* at 338–339. After recounting details of relevant evidence the Court noted that the facts that a person is armed when entering an area of a crime or while committing one has "probative value in proving deliberately," and the fact that there was a struggle "does not negate an inference of deliberate conduct," especially where it seems "the killing took place when the victim refused to part with particular property;" thus the Court concluded:

> consideration: 'a conscious decision involving a thought process; conduct which embraces more than mere will to engage in the conduct.' "

Cf. *Russell v. State,* supra, at 787 (Dissenting opinion)

---

**13.** Pointing out that "deliberately" has a meaning different and distinct from "intentionally," the definition given by the trial court continues:
"[T]he word 'deliberately' as used in this first special issue means a manner of doing an act characterized by or resulting from careful

"Here, appellant carried a loaded pistol to the scene of the robbery. He lay in wait for his victim. After struggling with her, he apparently bested her efforts, but did not seek to escape without further harming her. Instead, the record clearly reflects he reached back, leveled and aimed the pistol at her, and squeezed the trigger with little or no chance of missing his target. There was sufficient evidence to support the jury's finding that appellant acted deliberately."

*Id.,* at 339.[14] Compare, however, *Andrews v. State,* 744 S.W.2d 40 (Tex.Cr.App.1987).[15]

Whether in context of voir dire, an instruction on "deliberately" or sufficiency of evidence, the Court remains lost in the maze it entered some twelve years ago. Without guidance, much of the bench and bar are also wandering around trying to find a way out.

On voir dire they conjure up hypothetical scenarios to put to venirepersons, and as often as not produce such bewilderment in the end that error is committed, e.g., *Gardner v. State,* 730 S.W.2d 675, at 684–690 (Tex.Cr.App.1987), cert. denied, —— U.S. ——, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987), sometimes compelling reversal of the judgment, e.g., *Lane v. State,* 743 S.W.2d 617, at 621–629 (Tex.Cr.App.1987):

"This Court has emphasized *the importance of jurors being able to accurately discern the separate meanings of intentional and deliberate conduct.* * * * * Even though this Court has properly declined to assume a legislative function and define 'deliberately', and instead relied on the 'ordinary meaning' of the term as a juror individually knows it, this Court cannot condone an attempt by

a State's attorney to mislead a juror into *believing that the definition of deliberate conduct is nothing more than a second finding of intentional conduct."*

\* \* \* \* \* \*

"In the instant case, juror Sutton was incapable of carrying out this crucial function [of comprehending meaning of the 'deliberateness question' as distinct from other inquiries in the case] because the hypothetical deceived him in believing his impression of deliberate was distinct from a legitimate inquiry into the intentional nature of the appellant's conduct. As mentioned in *Gardner,* the defense may successfully challenge for cause a 'venireman who is unable to reconsider guilt evidence in the particular context of special issues.' Certainly the venireman who cannot distinguish between an 'intentional' and a 'deliberate' killing will have substantial difficulty in this regard. *Gardner,* supra, at 689.

\* \* \* \* "

*Id.,* at 628–629. Concerning venireperson Sutton, another complaint was the trial court erred in restricting questioning as to "his understanding of special issue number one," and the Court similarly found, *viz:*

"... As we quoted from *Gardner,* supra, this was a proper inquiry for the defense *in light of the hypothetical used by the State.* This was a denial of the appellant's opportunity to intelligently exercise his voir dire of juror Sutton."

Harm having been shown and not cured, the judgment was reversed on this point of error as well. *Id.,* at 629. Accord: *Morrow v. State,* 753 S.W.2d 372 (Tex.Cr.App. 1988); *Felder v. State,* 758 S.W.2d 760, at 767–770 (Tex.Cr.App.1988).

**14.** In note 18 is an observation that the evidence does not support his theory that he was "surprised when Complainant began struggling [and] during the course of the struggle, the gun discharged killing Complainant." *Ibid.*

**15.** Although sketching various approaches to the problem, the plurality opinion actually avoids it, *viz:*

"In this instance, we do not find that it is necessary to involve ourselves in or engage in the ongoing controversy whether the word 'deliberately' has now obtained a technical or

special meaning, and thus should be expressly defined in the punishment charge of a capital murder case [because there is overwhelming evidence that conduct of defendant was deliberate]."

*Id.,* at 51–52. In that the issue then being considered was whether § 19.03(a)(2) coupled with § 7.02(a)(2) or (b) is unconstitutional as applied, that six Judges merely concurred in the result suggests they regarded the predicate discussion to be somewhat irrelevant and basically fruitless.

On the matter of jury instruction, even when one is requested the Court continues to write about simplicity of the term in its ordinary meaning as "approximated," yet to say it is "not necessary" to give an requested instruction, thereby implying that a judge may inform a jury as to that meaning of "deliberately" as determined by this Court, *Fearance v. State,* 771 S.W.2d 486, 512–513 (Tex.Cr.App.1988); and when an appellant renews the argument that the term is synonymous with "intentionally," we reprise *Heckert* to presume that the Legislature enacted special issue one with a different standard in mind, *Tucker v. State,* 771 S.W.2d 523, 536–537 (Tex.Cr.App.1988).

Concurring in *Lane,* supra, Judge Duncan agreed with those verities therein stated by the Court, observed that "this Court has been inundated with appeals in which there was obvious confusion among the judges, lawyers and jurors as to how 'intentionally' could be different from 'deliberately,' " recalled that in *Williams v. State,* supra, four Judges would have a trial judge honor a timely request for an in-

structive definition of "deliberately" suggested by the dissenting opinion in *Russell v. State,* supra, 665 S.W.2d, at 787, and associated himself with them, viz:

"Based on the foregoing observations, it is my opinion that the absence of a definition of 'deliberately' during the punishment phase of a capital murder trial does nothing to further the administration of justice in that it invariably causes confusion among the judges, lawyers and jurors. Therefore, in the future (trials that commence after the date of this opinion) I would suggest that upon request by either the State or the defendant that trial judges give the jury an appropriate definition of 'deliberately' that they are to use in answering the first special issue under Article 37.-071(b)(1)."

*Id.,* at 630–631.[16]

This Court created such a maze that a meaningful definition of "deliberately" is lost and cannot be found from our opinions. There is a decision to support almost any meaning one might desire to use in a certain situation. Presently this Court is

---

**16.** Of course, in implementing that suggestion we merely demonstrate that this Court is capable of discharging its judicial function, rather than making entreaties for legislative action as was done by the majority, *id.,* n. 7, at 628, and again in *Nichols v. State,* 754 S.W.2d 185, at 201, n. 17, *viz:*

"We note that the Legislature has not, as yet, accepted our oft repeated invitation to statutorily define 'deliberately' in the context of 37.071(b)(1). See *Lane, supra* at 628, n. 7, 630, n. 11 and 630–631 (Duncan, J., concurring); *Williams, supra* at 322, n. 6. *Thus no explicit definition can be applied herein.* Once again we note the need for a statutory definition and exemplify the clarification to be afforded by legislative action in this area."

*Id.,* n. 17, at 201. But the Legislature does not expect the Judicial Department to be suppliant in such matters. Inherent in all appellate courts is power—indeed a duty—to interpret and construe legislative enactments. See generally Aldisert, The Judicial Process (American Casebook Series, West Publishing Co. 1976) Chapter 1, Section 4, 170ff.

Courts exercising criminal jurisdiction have power and authority to interpret criminal statutes passed by the Legislature, *Crouch v. Craik,* 369 S.W.2d 311, 315 (Tex.1963), to the exclusion

of all others save courts of equity with jurisdiction to enjoin enforcement of penal law in exceptional situations, *State v. Shoppers World Inc.,* 380 S.W.2d 107, 110 (Tex.1964), and *Passel v. Fort Worth Independent School District,* 440 S.W.2d 61, at 63 (Tex.1969). Otherwise, for instance, "probable cause" would defy understanding.

The Court has recognized and followed a cardinal rule of statutory construction, *viz:*

"In determining the meaning of a word employed in statute the inquiry is not as to its abstract meaning, but as to *the sense in which it is used.* When the legislative purpose so requires, a word may be given a broader or narrower meaning than that which it has in *ordinary usage. Bailey v. State,* 104 Tex.Cr.R. 432, 284 S.W. 574."

*Baldridge v. State,* 167 Tex.Cr.R. 519, 321 S.W.2d 309, at 310 (1959). In *Bailey v. State,* supra, at 576, the Court relied in part on "a learned text-writer," namely, Lewis' Sutherland on Statutory Construction, vol. 2, § 376, p. 222, *viz:* "The particular inquiry is, not what is the abstract force of the words or what they may comprehend, *but in what sense they are intended to be used as they are found in the act.*" See also 53 Tex.Jur.2d *Statutes* § 147. Determination of meaning. (1964).

bound by its duty to interpret and construe special issue one in order that the bench and bar may give it the force and effect contemplated by the Legislature.

Judge Learned Hand put it correctly, *viz:* "... It is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of a dictionary; but to remember that statutes always have some purpose or object to accomplish whose sympathetic and imaginative discovery is the surest guide to their meaning."

*Cabell v. Markham,* 148 F.2d 737, at 739 (CA2 1945).

Accordingly, we need be mindful of a synopsis of constitutional rationale relating to discretion of the "sentencer," set forth in the plurality opinion of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *viz:*

"... [The State] must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process of imposing a sentence of death.' As was made clear in *Gregg,* a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' 428 U.S., at 195, n. 26 [96 S.Ct. at 2935, n. 46]."

Because the majority piously defers to the Legislature to lead participants in the criminal justice system out of the maze this Court itself created, I dissent.

TEAGUE, J., joins in this opinion.

Before the court en banc.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

CAMPBELL, Judge.

Appellant was convicted of capital murder. On original submission we affirmed

appellant's conviction. *James v. State,* 772 S.W.2d 84 (Tex.Cr.App.1989). We granted appellant's motion for rehearing for the sole purpose of addressing a point of error raised, but not addressed on original submission.[1]

Appellant argues that the trial judge erred in overruling appellant's request for a special instruction at the punishment phase which would inform the jury that "intentional" and "deliberate" have different meanings. The State responds that appellant failed to preserve this error and, alternately, under *Williams v. State,* 674 S.W.2d 315 (Tex.Cr.App.1984), that no such instruction was necessary.

Art. 36.15 V.A.C.C.P. provides that if a party requests a special instruction which is not incorporated into the charge, no additional objection is required. Prior to the charge being delivered to the jury, appellant requested that the following instruction be included in the charge:

[A]s used in the first special issue, the word 'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge on guilt.

We find that error, if any, was preserved.

In *Heckert v. State,* 612 S.W.2d 549, 552 (Tex.Cr.App.1981), we held that "deliberate," as used in Art. 37.071(b)(1) V.A.C.C.P., is not the "linguistic equivalent" of "intentional," as used in V.T.C.A. Penal Code, § 19.02(a)(1). Appellant uses this holding as the legal basis for this requested instruction. Although the requested instruction correctly states the law, a defendant is not entitled to an instruction merely because it correctly states the law. See, e.g., *Sanders v. State,* 707 S.W.2d 78 (Tex.Cr.App.1986). The instant case is such an example of a "correct" instruction that is not required.[2]

---

**1.** This was originally appellant's second point of error. Point of error three was identified in the original opinion as point of error two.

**2.** In *Williams v. State,* 674 S.W.2d 315 (Tex.Cr. App.1984), the defendant requested that the charge define "deliberate." We stated, "while a definition of deliberate would have been help-

█ As stated in our opinion on original submission, there is no need to define the word "deliberate" in the charge to the jury. The basis for this holding is that words not defined statutorily are deemed to employ their usual meanings and the jury is capable of utilizing that usual meaning without a specific instruction. *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977). Because we assume that jurors attach a common understanding to the meaning of the term "deliberate" and they were given the statutory definition of "intentional" in the charge on guilt/innocence, they were able to draw distinctions between the two words without specific guidance from the trial court. In addition, during voir dire, the jurors were informed by both counsel that the two words have different meanings and that a finding of "intentional" conduct at guilt/innocence would not mean that they should automatically answer the first special issue affirmatively. For these reasons, the trial judge did not err in denying appellant's requested instruction. Appellant's point of error is overruled.

Appellant's motion for rehearing is in all respects denied, and the judgment of the trial court is affirmed.

DUNCAN, J., concurs in result.

CLINTON and TEAGUE, JJ., dissent.

ful, it was not essential and we therefore find no error is presented." *Id.* at 622.

A footnote in *Williams,* supra at 322 n. 6, went on to say that a majority of the Court did not feel that an instruction to the effect that "intentional" and "deliberate" have distinct definitions was necessary. This footnote, although agreeing with today's decision, is not controlling. The issue presented in this point of error was not present in *Williams,* thus making the statement dictum.