Affirmed and Memorandum Opinion filed May 27, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00846-CR

___________________

 

Larry Joseph Tillman, Jr., Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 262nd District Court

Harris County,
Texas



Trial Court Cause No. 1059831

 



 

 

MEMORANDUM OPINION

Appellant, Larry Joseph Tillman, Jr.,
appeals his conviction for capital murder.  Tex. Penal Code Ann. § § 12.31(b),
19.03(a)(2) (Vernon 2003).  Finding no error, we affirm.

Factual and Procedural Background

Late in the evening of December 21, 2005, complainants,
Amandre Wilson and her fiancé, Joseph Liebetreu, were returning to Wilson’s
residence following a charity ball.  While driving home, one of the
complainants turned on the dome light in their vehicle.  This brief flash of
light drew the attention of three men, appellant, Malcolm Williams, and
Cornelius Clark, who were driving around looking for a way of making money. 
The trio, having noticed the complainants’ attire, decided the complainants “would
be easy picking . . . to rob.”

The trio followed the complainants to Wilson’s
residence, which was located on Floyd Street in a gated townhome complex. 
Immediately after the complainants drove through the security gate, appellant
was dropped off by his companions and he walked through the still open gate into
the complex.  The initial plan was to rob the complainants in their garage, but
appellant was momentarily delayed as he had to hide from two pedestrians
walking down the driveway and was unable to reach the complainants before the
garage door closed.  Undeterred, appellant walked to the front door of Wilson’s
townhome and rang the doorbell.  In response to the doorbell, Wilson partially
opened the door but left the security chain in place.  When Wilson realized the
danger, she managed to close the door, but appellant quickly kicked it in.

Ricardo Avila lived across the street from Wilson’s
townhome.  Avila was still up shortly after midnight on December 22, 2005, when
he heard two gunshots coming from the direction of Wilson’s townhome.  Avila
then heard Liebetreu scream: “Hey, you get out of here.”  Avila then heard two
more gunshots.  Following the second set of gunshots, Avila saw an extremely
tall African-American male walking from Wilson’s front door.  Avila, a
hairdresser accustomed to observing facial details, got a good view of the
African-American male’s face.  Avila ran to his neighbor Bruce Coy’s house and
knocked on his front door.  Avila then called 9-1-1.  After the police arrived,
Avila informed the police the African-American male was wearing a black thigh-length
coat and a knit cap and was carrying a full garbage bag over his shoulder. 
Avila later met with a sketch artist who recreated the man Avila observed
fleeing Wilson’s townhome.

Dan Christoffel lived in the same townhome complex as
Wilson.  While riding with his brother down Leverkuhn Street, which intersects
with Floyd Street, sometime soon after midnight on December 22, 2005,
Christoffel saw a tall African-American male running toward their vehicle. 
Christoffel observed the African-American male suddenly stop running and
commence walking when he saw the headlights from Christoffel’s brother’s
vehicle.  The African-American male continued walking toward Christoffel. 
Christoffel passed within four to six feet of the African-American male. 
According to Christoffel, the African-American male had a “baby face” and was
wearing a big, thigh- length coat and a knit cap.

When paramedics and the police arrived, they
determined both complainants were dead at the scene.  They also discovered a number
of bloody footprints both inside and outside Wilson’s townhome.  Police officer
Jeff Cruser works in the crime scene unit of the Houston Police Department’s
homicide division and he was assigned to handle this crime scene.  Cruser
photographed and measured some of the bloody footprints.  The photographs were eventually
sent to the Federal Bureau of Investigation laboratory.  During trial, Special
Agent Eric Gilkerson testified he is a shoe print and tire tread examiner for
the F.B.I.  Gilkerson testified the shoe prints were made by a Reebok I3
pressure mid shoe manufactured between 2002 and 2004.  

Later, as part of the investigation of the murders, the
police arranged a live lineup.  Avila positively identified appellant as the
African-American male he observed leaving Wilson’s townhome.  Christoffel
identified two men, one of them appellant, as possibly being the individual he
saw that night on Leverkuhn.

Hoping to collect money owed to him by a man he knew
only as Jabo, Bobby Williams, in the early morning hours of December 22, 2005,
went to the Flamingo Square Apartments where Jabo’s parents lived.  Jabo was
not there when Williams arrived, but Williams waited and passed the time
talking to Jabo’s parents.  Twenty to thirty minutes later, Jabo and two other
African-American males entered the apartment through the kitchen door.  The
third male was very large and was wearing a dark mid-thigh length coat and a
knit cap.  He was also carrying a revolver and a large trash bag.  Williams
later identified Jabo as Cornelius Clark, the second male as Malcolm Williams,
and the very large, third male, as appellant.

The three men proceeded through the kitchen and into the
living room where a fourth African-American male had been playing videogames. 
The three newcomers gathered around the couch and began displaying items from
the trash bag and talking to the videogame player.  Williams then heard
appellant describe the robbery.  According to appellant, when Wilson refused to
remove the security chain and closed the door, he forced his way in by kicking
in the door.  Appellant then said he shot Wilson because she would not
cooperate and then shot Liebetreu because he had seen appellant’s face. 
Williams then left the apartment, but as he left, he wrote down the license
plate number of the silver Crown Victoria the three men were driving.

Later that morning, Williams attempted to contact
Houston Police officer David Bonin, an officer Williams had worked with on
other cases, but Bonin was on vacation.  Williams then went to LBJ Hospital and
spoke with a Harris County Deputy who recommended that Williams contact Crime
Stoppers.  Williams then called Crime Stoppers with the information he learned
at the Flamingo Square Apartments.  Williams later accompanied police
investigators into the neighborhood around the Flamingo Square Apartments and
was able to identify appellant as the third male to enter Jabo’s kitchen. 
Williams later identified Clark, Malcolm Williams, and appellant in live lineups.

During trial, Karen O’Bannion, an investigator for
the Harris County District Attorney, testified regarding her participation in
the investigation of the bloody footprints.  O’Bannion measured appellant’s
foot size as well as his height.  According to O’Bannion, appellant’s foot measured
larger than 15 1/2 and he stood six feet, seven inches tall.[1]  Finally,
O’Bannion recovered the shoes appellant was wearing the day she measured his
feet.  O’Bannion testified the shoes were size 15.  The shoes were then admitted
into evidence.

William J. Bodziak, a forensic consultant
specializing in the areas of footwear and tire impression evidence, testified
for the prosecution.  Bodziak testified the bloody footprints were made by a
size 15 shoe.  Bodziak testified that Reebok did not make the I3 mid pressure
shoe in a size larger than size 15.  Finally, Bodziak testified he received all
of the measurements of appellant’s feet taken by Investigator O’Bannion and,
using those measurements, he determined that appellant’s feet could fit inside
a size 15 Reebok I3 mid pressure shoe.

Following the close of the evidence, the jury found
appellant guilty of capital murder.  The trial court assessed the automatic
punishment of confinement for life in the Institutional Division of the Texas
Department of Criminal Justice.  This appeal followed.

Discussion

            Appellant raises
six issues on appeal.  We address each issue in turn.

I.         Did
the trial court abuse its discretion when it excluded Dr. Malpass’s testimony?

In his first issue, appellant asserts the trial court
abused its discretion when it excluded the testimony of Dr. Roy Malpass,
appellant’s psychologist expert witness.    We disagree.

A.        The standard of review and applicable law.

A trial court’s decision to exclude an expert’s
testimony is reviewed for an abuse of discretion.  Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App.
2000).  If the trial court’s ruling lies within the zone of reasonable
disagreement, the trial court’s ruling will not be reversed on appeal.  Id.

Admission of expert testimony is governed by Texas
Rule of Evidence 702.  Morales v. State, 32 S.W.3d 862, 865 (Tex. Crim.
App. 2000).  Rule 702 provides: “[i]f scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.”  Tex. R. Evid. 702.  The proponent of the expert
testimony must show by clear and convincing proof that the evidence he seeks to
introduce is sufficiently relevant and reliable to assist the trier of fact in
accurately understanding other evidence or determining a fact at issue.  Weatherred,
15 S.W.3d at 542.

Here, only the relevance of Dr. Malpass’ testimony is
at issue.  To be relevant, expert testimony must make an effort to tie
pertinent facts of the case to the scientific principles which are the subjects
of the testimony so as to be helpful to the trier of fact.  Salazar v. State,
127 S.W.3d 355, 360 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d) (citing Jordan
v. State, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).

B.        The
trial court did not abuse its discretion when it excluded Dr. Malpass from
testifying.

Appellant offered the testimony of Dr. Malpass, a
psychologist at the University of Texas at El Paso, on the subject of the
reliability of the State’s identification procedures, specifically the use of a
photospread before the use of a lineup. The trial court conducted a Daubert[2] hearing outside
the presence of the jury during which Dr. Malpass testified.

During the hearing, Dr. Malpass testified he was not there
to testify about the accuracy of any particular witness’ testimony.  Dr.
Malpass also told the trial court that he did not “intend to tell [the jury]
about the specific lineup or photospread.”  Instead, Dr. Malpass intended “to
discuss the way in which this was employed.”   Dr. Malpass also informed the
trial court that he intended to testify that the use of a photospread prior to
gaining an identification of a suspect in a physical lineup is a biasing factor
against a defendant.  Dr. Malpass also discussed the studies addressing eyewitness
identifications involving photospreads and lineups.  According to Dr. Malpass,
while he was familiar with more than thirty such studies, he had not personally
conducted any of them.  Dr. Malpass also informed the trial court that he had
participated in the creation of the Department of Justice’s publication
“Eyewitness Evidence, a Guide for Law Enforcement” and that this guide would
not approve a procedure where an eyewitness is shown a photospread before
making an identification in a live lineup.   However, when asked on
cross-examination to point out in the guide where it says law enforcement
personnel should not use that procedure, Dr. Malpass was unable to do so.  Dr.
Malpass also testified that he was not present during the testimony of either
Ricardo Avila or Dan Christoffel.  Finally, when asked by the prosecutor if he
had been asleep during much of the testimony of one of the primary police
investigators in the case, Dr. Malpass denied that he had been asleep.

Following Dr. Malpass’s testimony, the trial court
noted for the record that (1) Dr. Malpass admitted that he had not been present
for the testimony of the eyewitnesses in the case; (2) Dr. Malpass had not done
any studies regarding a lineup following a photospread; and (3) despite
testifying that the Department of Justice publication “Eyewitness Evidence, a
Guide for Law Enforcement” advised against using an identification procedure
that involved a photospread followed by a live lineup, Dr. Malpass, when given
time to do so, was unable to point out the location of that particular advice
in the guide.  Finally, the trial court noted that, after he had been informed
that it was essential to the formation of Dr. Malpass’s opinion and testimony
that Dr. Malpass be allowed to sit through the trial, he had observed Dr.
Malpass sleeping several times during the trial.  The trial court then concluded
Dr. Malpass’s opinion and projected testimony based on that opinion would not
be relevant and excluded him from testifying.

As demonstrated above, Dr. Malpass demonstrated no
knowledge of the facts of this case and made no effort to connect his opinion
with those facts.  Instead, Dr. Malpass’s opinion testimony was offered only as
general educational material for the jury.  Because Dr. Malpass’s opinion
testimony was not tied to the facts of the case, we conclude it would not help
the jury understand other evidence or determine a fact at issue and therefore
was not relevant.  Id.  Accordingly, we hold the trial court’s decision
to exclude Dr. Malpass’s testimony was within the zone of reasonable
disagreement and overrule appellant’s first issue.

II.        Does
Article 38.141 of the Code of Criminal Procedure require the State to
corroborate Bobby Williams’ testimony?

In his second issue, appellant argues there was
insufficient evidence corroborating the testimony of the Crime Stoppers
informant, Bobby Williams.  According to appellant, article 38.141 of the Code
of Criminal Procedure required the State to introduce evidence corroborating
Bobby Williams’ testimony.  Because article 38.141 does not apply to this case,
we disagree.

Article 38.141(a) provides:

A defendant may not be convicted of an offense under Chapter
481, Health and Safety Code, on the testimony of a person who is not a licensed
peace officer or a special investigator but who is acting covertly on behalf of
a law enforcement agency or under the color of law enforcement unless the
testimony is corroborated by other evidence tending to connect the defendant
with the offense committed.

Tex. Code Crim. Proc. Ann.
art. 38.141(a) (Vernon 2005).  By its plain language, article 38.141(a) only
applies to an offense under Chapter 481 of the Health and Safety Code, also
known as the Texas Controlled Substance Act.  Appellant was charged with, and
convicted of, capital murder pursuant to section 19.03 of the Penal Code.  Because
article 38.141 does not apply under the facts of this case, we overrule
appellant’s second issue.

III.      Did appellant
waive his third issue on appeal?

In his third issue, appellant asserts the trial court
abused its discretion when it allegedly prohibited appellant the opportunity to
impeach witness Carlos Rodriguez concerning his gang affiliation.  However, in
the entirety of his third issue, appellant does not provide a single reference
to the record directing this court to where the trial court denied him the
opportunity to cross-examine Carlos Rodriguez about his alleged gang affiliation
or where he made an offer of proof or bill of exception to preserve this issue
for appellate review.  Accordingly, we conclude appellant has waived this issue
on appeal.  See Tex. R. App. P. 38.1(i) (providing that a brief must
contain a clear and concise argument for the contentions made, with appropriate
citations to authorities and the record).

IV.      Did
the trial court abuse its discretion when it overruled appellant’s Rule 403
objection to the admission of some of the complainants’ autopsy photographs?

In his fourth issue, appellant complains of the trial
court’s admission of several autopsy photographs of the two complainants. 
According to appellant, the probative value of the photographs was
substantially outweighed by the danger of unfair prejudice due to their
“unnecessarily graphic and gruesome depictions.”  We disagree.[3]

Appellant complains of three photographs taken during
the autopsy of Wilson.  The first photograph, Exhibit 91, depicted a frontal
view of Wilson’s nude upper body showing two gunshot wounds, one to the right
upper chest, the second to her left cheek. The second photograph, Exhibit 96,
showed the backside of Wilson’s nude upper body showing the exit wound from the
gunshot wound to her upper chest and a second view of the gunshot wound to her
cheek.  The final photograph, Exhibit 97 is a close-up photograph of the
gunshot wound to Wilson’s cheek.  Appellant also complains about four
photographs taken during the autopsy of Liebetrau.  The first photograph,
Exhibit 102, depicts the right side of Liebetrau’s nude torso and a single
gunshot wound.  The second, Exhibit 103, is a close-up photograph of the
gunshot wound.  The two remaining photographs, Exhibits 104 and 105, show the
blood soaked shirt worn by Liebetrau with a gunshot hole in the front.

A trial court’s ruling whether to exclude evidence
under Rule 403 of the Texas Rules of Evidence is measured by an abuse of
discretion standard and will not be reversed if the ruling is within the zone
of reasonable disagreement.  Andrade v. State, 246 S.W.3d 217, 227 (Tex.
App.—Houston [14th Dist.] 2007, pet. ref’d).

Evidence is relevant if it has any tendency to make
the existence of any fact of consequence to the determination of the action
more probable or less probable than it would be without the evidence.  Tex. R.
Evid. 401.  Relevant evidence may be excluded by the trial court under Rule 403
“if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative
evidence.”  Tex. R. Evid. 403.  Rule 403 favors the admission of relevant
evidence and carries a presumption that relevant evidence will be more
probative than prejudicial.  Andrade, 246 S.W.3d at 227.  In conducting
a Rule 403 analysis, a trial court must balance (1) the inherent probative
force of the proffered item of evidence along with (2) the proponent’s need for
that evidence against (3) any tendency of the evidence to suggest a decision on
an improper basis, (4) any tendency of the evidence to confuse or distract the
jury from the main issues, (5) any tendency of the evidence to be given undue
weight by a jury that has not been equipped to evaluate the probative force of
the evidence, and (6) the likelihood that the presentation of the evidence will
consume an inordinate amount of time or repeat evidence already admitted.  Casey
v. State, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007).

A.        Probative Force and Need for the
Evidence

We begin with an evaluation of the probative value of
the photographs; that is, the inherent probative force of the item of evidence
coupled with the proponent’s need for that item of evidence.  Id. at
879.  Probative force refers to how strongly the item of evidence serves to
make more or less probable the existence of a fact of consequence to the
litigation.  Id.  Here, Dr. Lopez utilized each of the photographs to
describe the injuries suffered by the complainants, how they occurred, and how
the wounds contributed to their deaths.  The photographs served as a visual
explanation of what happened that evening in Wilson’s townhome and thereby
helped to clarify Dr. Lopez’s testimony for the jury.  Photographs are neither
cumulative nor lacking in significant probative value simply because they
merely corroborate other kinds of evidence.  Chamberlain v. State, 998
S.W.2d 230, 237 (Tex. Crim. App. 1999); Williams v. State, 937 S.W.2d
479, 488 (Tex. Crim. App. 1996).  Therefore, we conclude that the contested
photographs had a high probative value as they were relevant and necessary for
the prosecution to aid the jury in understanding not only the complainants’
injuries but also the course of events in Wilson’s townhome.

B.        Rule 403 Counterfactors

We now turn to balancing the photographs’ probative
value against the Rule 403 counterfactors.  Casey, 215 S.W.3d at 883.

1.         Potential to Impress the Jury

We begin by examining whether the contested
photographs have the potential to impress the jury in an irrational but
indelible way.  Andrade, 246 S.W.3d at 228.  Rule 403 requires that an
admissible photograph possess “some probative value and that its probative
value not be substantially outweighed by its inflammatory nature.”  Long v.
State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991) (emphasis in original). 
When reviewing a challenge to the admissibility of photographs, we consider
factors including the number of photographs offered, their gruesomeness, their
detail, their size, whether they are color or black and white, whether they are
close-up, and whether the body is naked or clothed.  Whitemire v. State,
183 S.W.3d 522, 531 (Tex. App.—Houston [14th Dist.] 2006, pet. ref’d).  Also,
the gruesomeness of the subject matter depicted in a photograph does not render
the photographs inadmissible if it merely reflects the reality of the brutal
crime committed.  Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App.
1995).

Here, appellant challenged the admissibility of seven
photographs which show the victims of the charged offense and an object of
clothing worn by one of the complainants.  The photographs were all taken prior
to the actual commencement of the complainants’ autopsies.  While some might
consider the photographs gruesome because they show the wounds suffered by the
complainants and the shirt worn by one complainant in some detail, they are not
enlarged or unnecessarily close-up, do not show large amounts of blood, or the
results of the actual autopsies.  In addition, while two of the photographs
show Wilson’s nude upper body, we conclude it was necessary to accurately show
one of the gunshot wounds she suffered.  Even assuming the photographs were presented
to the jury in color,[4]
we hold the images were not of such a horrifying or appalling nature that a
juror of normal sensitivity would have had difficulty rationally deciding the
critical issues of the case after reviewing any of them individually or
cumulatively.  Because the photographs simply reflect the results of a brutal
criminal act, we conclude this factor does not weigh against admitting the
photographs.[5]

2.         Confusion of the Issues

Next, we inquire as to the tendency of the evidence
to confuse or distract the jury from the main issues.  See Casey, 215
S.W.3d at 880. Because the photographs show the results of the charged offense,
we conclude they could not confuse or distract the jury from the issue before
them.  This factor does not weigh against admitting the photographs.

3.         Misleading the Jury

Third, we examine any tendency of the challenged
photographs to be given undue weight by a jury on any basis other than
emotional grounds.  Gigliobianco v. State, 210 S.W.3d 637, 641 (Tex.
Crim. App. 2006).  “For example, ‘scientific’ evidence might mislead a jury
that is not properly equipped to judge the probative force of the evidence.”  Id. 
Here, we conclude this factor actually weighs in favor of the admission of the
photographs as they provided a visual reference the jury could use to
understand the medical examiner’s testimony regarding the wounds suffered by
the complainants.

4.         Undue Delay

Finally, we examine the likelihood that presentation
of the photographs will consume an inordinate amount of time or merely repeat
evidence already admitted.  Id. at 641–42.  This factor concerns the
efficiency of the trial proceeding rather than the threat of an inaccurate
decision.  Id. at 641.  The time involved in the admission of the
photographs was minimal as there were only seven challenged photographs and
each was a different image of the complainants’ wounds or clothing worn at the
time of the offense.  We also conclude the evidence was not cumulative of other
evidence as it served as a visual explanation of the complainants’ wounds in
addition to the testimony of the medical examiner.  We conclude this factor
also does not weigh against admission of the photographs.  

  Having considered all of the Rule 403 factors, we hold
the trial court did not abuse its discretion when it admitted the challenged
photographs.  We overrule appellant’s fourth issue on appeal.

 

 

V.        Did the trial court err
when it overruled appellant’s objection to the State’s questioning of a witness
about the presence of appellant’s attorney at the lineup?

In his fifth issue on appeal, appellant contends the
trial court erred when it allowed the State to question Ricardo Avila about the
presence of appellant’s attorney at the lineup where Avila identified appellant
as the person he saw leaving Wilson’s townhome.  Appellant argues this line of
questions impermissibly commented on appellant’s invocation of his right to
counsel under the Fifth Amendment to the United States Constitution and his
right to due process under the Fourteenth.  According to appellant, this type
of testimony “is never admissible because it can create an adverse,
constitutionally impermissible inference of guilt in the jury’s mind.”  We
disagree with appellant’s contention that evidence that a criminal defendant is
represented by counsel at a lineup is absolutely inadmissible under any
circumstances.

            The
Fifth Amendment right to counsel is invoked when the person is subjected to
custodial interrogation.  Miranda v. Arizona, 384 U.S. 436, 469, 86 S. Ct.
1602, 16 L. Ed.2d 694 (1966); Griffith v. State, 55 S.W.3d 598, 602
(Tex. Crim. App. 2001).  The United States Supreme Court has held that a
suspect lineup (i.e. the mere showing of a suspect to potential witnesses) is
not “testimonial” and therefore, does not implicate the Fifth Amendment’s right
to counsel.  United States v. Wade, 388 U.S. 218, 221–22, 87 S.Ct. 1926,
1929–30, 18 L.Ed.2d 1149 (1967).  However, the guaranty of fundamental fairness
in the Due Process Clause forbids the government from making the Miranda
promises and then breaking them by using a suspect’s exercise of his right to
counsel as evidence against him.  Griffith, 55 S.W.3d at 605.  Thus, evidence
of a defendant invoking his right to counsel is inadmissible as evidence of
guilt.  Hardie v. State, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991).

The Sixth Amendment
provides that “[i]n all criminal prosecutions, the accused shall enjoy the
right … to have the Assistance of Counsel for his defense.” Hidalgo v. State,
983 S.W.2d 746, 752 (Tex. Crim. App. 1999) (quoting U.S. Const. amend. VI).  Under the United States
Constitution, the Sixth Amendment right to counsel attaches upon the
commencement of adversarial proceedings.  Id.  The right extends to all
critical stages of the criminal proceeding.  Id.  The United States
Supreme Court has not announced a bright line rule to mark the commencement of
adversarial proceedings, nor has the Court of Criminal Appeals.  Id. 
While the Sixth Amendment right to counsel is not triggered just by an arrest,
it has been determined that the following do mark the commencement of
adversarial proceedings: (1) the filing of an indictment, (2) the filing of an
information and complaint, (3) arraignment; and (4) an Article 15.17 “warning hearing,”
before a magistrate where an arrest warrant was present.  Id. at n.11.  Participation
in a live lineup once adversarial proceedings have commenced is one of those
critical stages.  Wade, 388 U.S. at 229, 87 S.Ct. at 1933.  

            In
the present case, the record demonstrates the following: (1) a warrant to
arrest appellant on charges of capital murder had been issued; (2) appellant
was arrested on those charges on March 1, 2006; and (3) the lineup at issue
here took place on March 8, 2006.  Article 15.17 of the Code of Criminal
Procedure requires that a person arrested pursuant to an arrest warrant must be
taken before a magistrate no later than 48 hours after his arrest and be
informed of the following: (1) the charges against him and any affidavit filed
therewith; (2) his right to retain counsel; (3) his right to remain silent; (4)
his right to have an attorney present during any interview with peace officers
or attorneys representing the state; (5) his right to terminate those
interviews at any time; (6) his right to have an examining trial; and (7) his
right to the appointment of counsel if he cannot afford to retain one and the
procedures to do so.  Tex. Code Crim. Proc. Ann. art. 15.17 (Vernon Supp. 2009).

Because the lineup
occurred more than 48 hours after appellant’s arrest, for purposes of this
appeal we will assume without deciding that appellant had received the Article
15.17 warnings and that adversarial proceedings had begun against him.  Because
adversarial proceedings had begun, appellant’s constitutionally guaranteed
right to counsel was in play and the State could not use evidence of
appellant’s invoking of that right as evidence of his guilt.  However, as explained below, we conclude the State’s
line of questions to Avila regarding the presence of appellant’s counsel at the
lineup did not violate appellant’s constitutional rights.

Following appellant’s
objection to the questioning of Avila regarding the presence of appellant’s
counsel at the lineup, this exchange occurred at the bench:

THE COURT:            Where are you going?

[PROSECUTOR]:     Just going through the lineup and
conversations that - - I’ve no intention of going into any privileged
conversations between the attorney and client.  There’s nothing reflected in my
report.  But I do know his previous attorney was present during the lineup to
protect his rights.  He actually selected some of the people in the lineup, and
had input whether or not where [appellant] chose to stand.

THE COURT:            But you’re not going to bring that up
through this witness?

[PROSECUTOR]:     No, I’m going to bring it out through the
officer, that part.  But I do want to - - the attorney did actually ask Mr.
Avila specific questions that I wanted to talk to Mr. Avila about.

THE COURT:            What was it?

MR. MOORE:[6]          He
asked him if he was sure.

THE COURT:            Who was the lawyer?

[PROSECUTOR]:     Connie Williams.

THE COURT:            Okay.  Mr. Isbell.[7]

MR. ISBELL:            We’re going to object to that.  It
seems to me that the invocation of counsel is always something a defendant has
the right to have without the jury knowing about it because the jury might draw
an obvious conclusion that that indicated guilt, and it impedes his right to
have counsel for that purpose.

[PROSECUTOR]:     May I respond to that?

THE COURT:            Yes.

[PROSECUTOR]:     That’s only for testimony in matters.  A
lineup identification is not a testimony in matter.  It’s not like he invoked
his right to remain silent or invoked his right to an attorney.

THE COURT:            You’re offering this to show the
propriety of the lineup that it was not suggestive?

MR. ISBELL:            We’re not challenging the lineup.

[PROSECUTOR]:     Well, pretty much everything in the
State’s case is being challenged.

[PROSECUTOR 2]:  I would like to make the Court aware that
they have an eyewitness identification expert that they have told us they
intend on calling.

THE COURT:            Okay.  I’ll allow it.  Okay. 
Overruled.

As demonstrated by the above, appellant’s trial
attorneys stated that they intended to call an eyewitness identification
expert.  We conclude that the State offered Avila’s testimony regarding the
presence of appellant’s attorney at the lineup not as evidence of his guilt, but to address a potential argument by appellant that
the lineup was suggestive or resulted in misidentification.  Therefore, we conclude the testimony regarding the
presence of appellant’s attorney at the lineup did not violate appellant’s
rights under the Fifth and Fourteenth Amendments.  See Hardie,
807 S.W.2d at 322; Jones v. State, 795 S.W.2d 171, 175–76 (Tex. Crim.
App. 1990).  We overrule appellant’s fifth issue.

VI.      Did the State
engage in an inappropriate closing argument?

In his sixth issue on appeal, appellant challenges
“the continued misconduct by the prosecutor which served no other purpose other
than to inflame and prejudice the minds of the jurors.”  Appellant then addresses
three specific time periods during the trial: (1) voir dire; (2) the
introduction of evidence; and (3) the prosecutor’s closing argument.  In
response, the State asserts appellant has waived this final issue because
appellant failed to (1) preserve the issue for appeal with timely objections;
and (2) adequately brief the issue by including a clear and concise argument
with appropriate citations to authorities and the record.  With the exception
of the closing argument section of the issue, we
agree with the State.

A.        Appellant
waived his contentions regarding the State’s allegedly improper voir dire and
solicitation of improper testimony.

While appellant divides his sixth issue into three
subparts, the legal authorities he cites address only improper jury argument. 
Because a brief must contain a clear and concise argument for the contentions
made that includes appropriate citations to legal authorities as well as the
trial record, we conclude appellant has waived consideration of his complaints
regarding the State’s conduct during voir dire and the evidentiary portion of
appellant’s trial.  Tex. R. App. P. 38.1(i).

B.        The
State’s closing argument was not improperly inflammatory and prejudicial.

Appellant complains about fourteen allegedly improper
statements made by the prosecutor during closing argument: (1) the prosecutor’s
comment about appellant’s cross-examination of Ricardo Avila improperly
attacked appellant “over the shoulders of his counsel;”[8] (2) the prosecutor
misrepresenting the testimony of police officer Flores; (3) the prosecutor
testifying about Avila’s evolving description of the man he saw emerge out of
Wilson’s townhouse between the time he gave his statement and when he met with
the police composite artist; (4) the prosecutor again allegedly testifying
about Avila’s evolving description of the man he saw emerge out of Wilson’s
townhouse between the time he gave his statement and when he met with the
police composite artist; (5) the prosecutor went outside the record when
discussing Dan Christoffel’s testimony regarding the clothing worn by the man
he saw on the street; (6) the prosecutor improperly put her credibility behind
the testimony of the two eyewitnesses; (7) the prosecutor’s sidebar comment
that she wished she had two eyewitnesses in every case; (8) the prosecutor argued
outside the record when describing Bobby Williams’ testimony; (9) through (12)
the prosecutor argued outside the record when describing Carlos Rodriguez’s
testimony about appellant wearing Allen Iverson shoes; (13) the prosecutor
improperly commented on appellant’s right to remain silent; and (14) the
prosecutor stating the community is hoping for a conviction of appellant.   

1.         The standard of review.

During closing argument, the State may properly
address the following areas: (1) summations of the evidence; (2) reasonable
deductions from the evidence; (3) responses to the defendant’s argument; and
(4) a plea for law enforcement.  Andrade, 246 S.W.3d at 229–30 (citing Lagrone
v. State, 942 S.W.2d 602, 619 (Tex. Crim. App. 1997)).  When improper jury
argument is alleged, we review the record in its entirety to determine whether
any erroneous statements were made, and if so, whether they were so prejudicial
as to deprive the defendant of a fair and impartial trial.  Johnson v. State,
233 S.W.3d 109, 114 n.4 (Tex. App.—Houston [14th Dist.] 2007, no pet.). 
However, before a defendant will be permitted to complain on appeal about an
erroneous jury argument, the defendant will have to show he objected and
pursued his objection to an adverse ruling.  Id. (citing Cockrell v.
State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)).  The failure to object to
a jury argument forfeits the right to complain about the argument on appeal.  Id. 
Therefore, we begin with a determination of whether appellant preserved his
complaints on each of the fourteen allegedly improper comments by the
prosecutor.

2.         Appellant failed to preserve his
complaints on items 2, 7, 8, 12, and 13.

When appellant objected to the prosecutor’s argument
regarding Officer Flores’ testimony about Avila (item 2) and Bobby Williams’
identification of appellant in a photospread and lineup (item 8), he failed to
obtain any ruling from the trial court, adverse or otherwise.  In addition,
appellant did not object to the trial court’s failure to rule.  To preserve a
complaint for appellate review, a party must have presented to the trial court
a timely request, objection, or motion that states the specific grounds for the
desired ruling if they are not apparent from the context of the request,
objection, or motion.  Moore v. State, 278 S.W.3d 444, 451 (Tex.
App.—Houston [14th Dist.] 2009, no pet.) (citing Tex. R. App. P. 33.1(a)(1)). 
Furthermore, the trial court must have ruled on the request, objection, or
motion, either expressly or implicitly, or the complaining party must have
objected to the trial court’s refusal to rule.  Id. (citing Tex. R. App.
P. 33.1(a)(2) and Mendez v. State, 138 S.W.3d 334, 338 (Tex. Crim. App.
2004)).  Because appellant did not pursue his objections to an adverse ruling,
he failed to preserve those objections for appellate review.  Id.

With regard to items 7, 12, and 13, appellant
objected to the prosecutor’s argument and the trial court sustained those objections
and then, sua sponte, instructed the jury to disregard the prosecutor’s
comment; however, appellant never requested an instruction to disregard and
never moved for a mistrial.  Therefore, appellant received all the relief he
requested.  Failure to request additional relief after an objection is
sustained preserves nothing for appellate review.  See Brooks v. State,
642 S.W.2d 791, 798 (Tex. Crim. App. 1982) (stating the proper method of
pursuing an objection until adverse ruling is to object, request an instruction
to disregard, and then move for a mistrial); see also Caron v. State,
162 S.W.3d 614, 617 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (same). 
Because appellant failed to pursue his objections to an adverse ruling, he
failed to preserve his complaints for appellate review.  Id.

3.       The
State’s discussion of Ricardo Avila’s testimony did not improperly strike at
appellant over the shoulders of his defense counsel.

In his first item included in his sixth issue,
appellant complains about the following argument made by the State:

Let’s begin with Ricardo Avila because after all that’s
where it did begin.  Ricardo Avila, he’s just a neighbor.  He’s got no ax to
grind.  He doesn’t even know who Larry Tillman is.  He just happened to be
there.  I bet you today he regrets it, after what he went through on the stand.

According to appellant, this
argument improperly struck at appellant over the shoulders of his defense
counsel because it was made in terms of defense counsel personally and it explicitly
impugned defense counsel’s character.  We disagree.

            Proper jury
argument may include summations of the evidence, reasonable deductions from the
evidence, as well as a response to the defendant’s closing argument.  Andrade,
246 S.W.3d at 229–30.  Here, the State was
responding to appellant’s argument attacking the credibility of Avila’s
testimony.  The challenged argument by the State encompassed information
directly from Avila’s testimony or that could be reasonably deduced from that
testimony.  In addition, the argument did not
personally and explicitly impugn the character of appellant’s defense counsel. 
Therefore, we conclude the trial court did not err when it overruled
appellant’s objection.  Even if the trial court had erred in overruling this
objection, we would conclude that the error is harmless.

4.         The
State did not argue outside the record regarding Ricardo Avila’s testimony.

In his third and fourth items within his sixth issue
on appeal, appellant contends the State argued outside the record regarding
Ricardo Avila’s testimony.  We again disagree.

Specifically, in his third item, appellant complains
of the following: “[Avila] said it in his sworn statement at 4 o’clock in the
morning the night after his friend was killed; but by the time he did that
composite, he figured out in his own mind that he was wrong.”

In his fourth item, appellant complains about this
argument by the State:

The guy he saw was taller, which is why on January 17th,
once again before Larry Tillman was even on the radar screen, he told Lois
Gibson the man he saw was taller, at least six-foot, six-two to six-four, thin
to average built, which I submit to you Larry Tillman looked a lot different
then than he does now.

Having reviewed the entire record, we conclude the
two challenged statements are proper summations of the evidence in the record
or could be reasonably deduced from that evidence and the trial court did not
err when it overruled appellant’s objections.

5.         The
State did not argue outside the record regarding Daniel Christoffel’s
testimony.

In item five, appellant contends the trial court
erred when it overruled his objection that the State was arguing outside the
record in this statement: “[i]s it just a coincidence that Larry Tillman was
seen wearing the same clothing from fleeing out of the house?”

Having examined the entire record, we conclude the
trial court did not err when it overruled appellant’s objection because this
argument by the State was reasonably deducible from evidence in the record. 
Avila, Christoffel, and Bobby Williams all testified about the coat and hat appellant
was seen wearing the evening of the double murder.  Each description of the
clothing included a large, thigh-length coat and a knit cap.  Therefore, we conclude
the State did not impermissibly stray outside the record by arguing that Christoffel
saw appellant wearing the same clothes that he was wearing moments earlier when
Avila saw him exit Wilson’s townhome.  Because the State was entitled to make
this argument based on the facts in evidence, we conclude the trial court did
not err when it overruled appellant’s objection.

6.         The
State did not improperly place its credibility behind the evidence regarding
appellant’s clothing.

In the sixth item, appellant complains about the
following argument: “So, it’s just a coincidence, same long jacket, same knit
cap?  No.  It’s the same guy.  He didn’t just get lucky.  You see, when the
truth is being told, things all tie together because it’s the truth.” 
According to appellant, this was an improper argument by the State because the
State’s “prosecutor was putting her own credibility behind the evidence by
saying it’s true.” 

Once again, having examined the entire record, we
conclude this argument by the State was not improper as it was a summation of
the evidence and was a response to appellant’s argument challenging the
identification of appellant by Avila, Christoffel, and Williams.  We hold the
trial court did not err when it overruled appellant’s objection to this
argument by the State.

7.         The
State’s argument regarding Carlos Rodriguez’s knowledge that appellant was
wearing Allen Iverson shoes was a proper summation of the evidence and a
response to appellant’s argument.

In his ninth and tenth items, appellant contends the
State argued outside the record twice when discussing the testimony of Carlos
Rodriguez.  First, appellant complains of the following: “How would Carlos
Rodriguez know that Larry Tillman was wearing Allen Iverson shoes when he
committed that cold-blooded killing?  When the only people in the world who
knew that were me, Karen O’Bannion, Erick Gilkerson and Bill Bodziak.”  Next,
appellant complains of this argument by the State:  “This is two solid years
after the case had been originally filed, two solid years.  Nobody knew it.” 
Because both complaints deal with the State’s argument discussing Carlos
Rodriguez’s testimony regarding appellant’s Reebok Allen Iverson shoes, we will
address them together.

During his direct testimony, Carlos Rodriguez testified
about appellant’s discussion of his involvement in the murder of complainants. 
According to Rodriguez, appellant told him about the bloody shoe print and that
it was made by an Allen Iverson shoe.  Rodriguez also testified that appellant
told him he did own some Allen Iverson shoes but that he had gotten rid of
them.  During his testimony, Rodriguez denied (1) that he had discussed the
case with Houston Police investigators; (2) that he had seen any news reports
about the murders that discussed bloody shoe prints or Allen Iverson shoes; and
(3) that he had been told anything about the type of shoes at issue in the case
from any member of the Harris County District Attorney’s office.  Instead,
Rodriguez testified he learned these details directly from appellant.  In
addition, during appellant’s closing argument, appellant questioned the
credibility of Rodriguez’s testimony, particularly the source of his knowledge
of appellant’s ownership of Allen Iverson shoes.  We conclude the challenged
arguments were reasonably deducible from the admitted evidence and were also a
direct response to appellant’s argument.  Therefore, we conclude the trial
court did not err when it overruled appellant’s objections.

8.         The
State’s argument regarding appellant wearing a size 15 shoe when his foot actually
measures larger than size 15 was proper.

In his eleventh item, appellant contends the
following argument by the State was improper because it was outside the record:

The Defense is running from those shoes as fast they can. 
Those shoes that they have argued vigorously have no connection to Larry
Tillman were taken off his feet in the Harris County Jail by Karen O’Bannion. 
They’re a size 15.  And, yeah, they might have been a little bit snug, but they
fit.  They fit and it’s probably all he wore.  Because he probably didn’t have
the money to custom order his shoes on the internet.[9]     

            Having
reviewed the entire record, we conclude this argument was based on evidence in
the record or reasonably deducible from that evidence.  Specifically,
Investigator O’Bannion testified that she removed the shoes that appellant was
wearing in the jail and that they were size 15.  These shoes were admitted into
evidence.  O’Bannion also testified that appellant’s foot measured larger than
a size 15.  William Bodziak, the footwear impression expert who formerly worked
with the Federal Bureau of Investigation laboratory, testified on the rarity of
large sized shoes in retail outlets.  Bodziak also testified it is not uncommon
for a person to wear a shoe that is either too small or too large for that
person’s foot.  According to Bodziak, one of the most prominent reasons for a
person resorting to smaller shoes is the availability or cost of obtaining the
proper size.  This testimony was further confirmed by retail analyst Lyn Lees. 
In addition, the argument was a direct response to appellant’s argument
pointing out the evidence that appellant’s foot measured larger than 15 while
the bloody footprint at the murder scene was made by a size 15 shoe.  We hold
the trial court did not err when it overruled appellant’s objection to this
argument by the State.

9.         The
trial court did not err when it overruled appellant’s objection to the final
part of the State’s argument, a plea for law enforcement.

            In his fourteenth
and final item in his sixth issue, appellant challenges the trial court’s
overruling of his objection to this argument by the State:

Larry Tillman is wrong.  The evidence is there, brick by
brick; and it’s solid.  And your friends that you’ll tell that story to,
they’ll ask you what was the evidence you had.  And you’ll tell them we had two
eyewitnesses that said that man.  We had two confessions, and we had physical
evidence that put him in the less than one half of one percent of the
population at that scene.  And they’ll say, well, I hope you convicted him.

According to appellant, this
argument improperly appealed to the expectations of the community in arriving
at the verdict.  We disagree.  Having reviewed the entire record, we conclude
this argument was first, a proper summation of the evidence, and second, a plea
for law enforcement.  Andrade, 246 S.W.3d at 230–31.  We hold the trial
court did not err when it overruled this objection by appellant.  Even if the
trial court had erred in overruling this objection, we would conclude that the
error is harmless.

Having addressed all items raised by appellant in his
sixth issue, we overrule his sixth issue on appeal.

Conclusion

            Having overruled
each of appellant’s issues on appeal, we affirm the trial court’s judgment. 

 

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Frost, and Boyce.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] O’Bannion testified she
used a Brannock Device to measure appellant’s foot size.  According to
O’Bannion this is the device commonly used in stores selling shoes to measure a
customer’s foot size.  She further testified the maximum size measured by the
Brannock device is 15 1/2.  O’Bannion testified she also drew an outline of
appellant’s feet and took an impression of them using a product called
Bio-foam.





[2] Daubert v. Merrell Dow
Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

 





[3] In its response brief,
the State contends appellant waived this complaint because he failed to object
to other evidence that conveyed the same information found in the photographs
shown to the jury.  Because the Court of Criminal Appeals has previously
determined that unobjected-to testimony regarding the same subject matter as
that depicted in a photograph does not result in waiver of an objection to the
inflammatory nature of the photograph unless the testimony conveys the same
aspects of the photograph which would be likely to inflame the minds of the
jurors, we refuse to find the appellant waived this issue.  See James v.
State, 772 S.W.2d 84, 98 (Tex. Crim. App. 1989), vacated on other
grounds by James v. Texas, 493 U.S. 885, 110 S.Ct. 225, 107 L.Ed.2d 178
(1989) (“The waiver rule that the State would have us invoke does not apply to
an objection to the gruesomeness of photographs unless the testimony itself is
gruesome and conveys the aspects of the photographs which would be likely to
inflame the minds of jurors.”).  





[4] The appellate record
contains only black and white copies of presumably color originals.  While we
can order the originals if necessary, we conclude that fact is immaterial as we
conclude the photographs are not overly gruesome even if they were in color as
they reflect the brutal nature of the complainants’ murders.





[5] Appellant’s reliance on
the case of Erazo v. State in support of his argument that the trial
court abused its discretion in admitting the photographs does not change our
analysis.  Erazo v. State, 144 S.W.3d 487 (Tex. Crim. App. 2004).  Erazo
is distinguishable as it involved photographs of victims not named in the
indictment, which is not at issue in the case before us.  See Prible
v. State, 175 S.W.3d 724, 736–37 (Tex. Crim. App. 2005) (citing Erazo).






[6] Mr. Moore was one of
appellant’s two trial counsel.





[7] Mr. Isbell was
appellant’s second trial counsel.





[8] The prosecutor’s actual
statement was:

Let’s begin with Ricardo Avila because after all
that’s where it did begin.  Ricardo Avila, he’s just a neighbor.  He’s got no
ax to grind.  He doesn’t even know who Larry Tillman is.  He just happened to
be there.  I bet you today he regrets it, after what he went through on the
stand.





[9] The shoes being discussed
here are not the size 15 Reebok Allen Iverson shoes that left a bloody
footprint at Wilson’s townhome, but the shoes that were removed from
appellant’s feet by Harris County District Attorney investigator Karen
O’Bannion as part of her investigation of the murders.